# In re R-A-, Respondent

Decided by Attorney General January 19, 2001

*Decided by Board June 11, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Jane B. Kroesche, Esquire, San Francisco, California, for respondent

Karen Musalo, Esquire, San Francisco, California, for amicus curiae[1]

Nancy Kelly, Esquire, and Deborah Anker, Esquire, Boston, Massachusetts, for amicus curiae

Amy T. Lee, Assistant District Counsel, for the Immigration and Naturalization Service

BEFORE THE ATTORNEY GENERAL
(January 19, 2001)

(1) The Attorney General vacates the decision of the Board of Immigration Appeals and remands the case to the Board for reconsideration following final publication of the proposed rule published at 65 Fed. Reg. 76,588 (proposed Dec. 7, 2000).

Pursuant to 8 C.F.R § 3.1(h)(1 )(iii), the Acting Commissioner of the Immigration and Naturalization Service has referred to the Attorney General for review the June 11, 1999, decision of the Board of Immigration Appeals (Board) that overturned the Immigration Judge's decision dated September 20, 1996. The June 11, 1999 decision of the Board is hereby vacated and the matter is remanded to the Board for reconsideration. I direct the Board to stay reconsideration of the decision until after the proposed rule published at 65 Fed. Reg. 76588 (Dec. 7, 2000) is published in final form. The Board should then reconsider the decision in light of the final rule.

BEFORE THE BOARD
(June 11, 1999)

(1) Where a victim of domestic violence fails to introduce meaningful evidence that her husband's behavior was influenced by his perception of her opinion, she has not demonstrated harm on account of political opinion or imputed political opinion.

---

[1]This Board acknowledges with appreciation the thoughtful arguments raised in amici curiae's brief.

906

(2) The existence of shared descriptive characteristics is not necessarily sufficient to qualify those possessing the common characteristics as members of a "particular social group" for the purposes of the refugee definition at section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994); rather, in construing the term in keeping with the other four statutory grounds, a number of factors are considered in deciding whether a grouping should be recognized as a basis for asylum, including how members of the grouping are perceived by the potential persecutor, by the asylum applicant, and by other members of the society.

(3) An applicant making a "particular social group" claim must make a showing from which it is reasonable to conclude that the persecutor was motivated to harm the applicant, at least in part, by the asserted group membership.

(4) An asylum applicant who claims persecution on the basis of a group defined as "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination" must demonstrate, inter alia, that her persecutor husband targeted and harmed her because he perceived her to be a member of this particular social group.

Before:    Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HUR-
           WITZ, FILPPU, COLE, MATHON, JONES, and GRANT, Board Members.
           Dissenting Opinion: GUENDELSBERGER, Board Member, joined by SCHMIDT,
           Chairman; VILLAGELIU, ROSENBERG, and MOSCATO, Board Members.

FILPPU, Board Member:

In a decision dated September 20, 1996, an Immigration Judge granted the respondent's application for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1994). The Immigration and Naturalization Service has timely appealed the grant of asylum. The Service's request for oral argument before the Board has been withdrawn. The appeal will be sustained.

## I. ISSUES

The question before us is whether the respondent qualifies as a "refugee" as a result of the heinous abuse she suffered and still fears from her husband in Guatemala. Specifically, we address whether the repeated spouse abuse inflicted on the respondent makes her eligible for asylum as an alien who has been persecuted on account of her membership in a particular social group or her political opinion. We find that the group identified by the Immigration Judge has not adequately been shown to be a "particular social group" for asylum purposes. We further find that the respondent has failed to show that her husband was motivated to harm her, even in part, because of her membership in a particular social group or because of an actual or imputed political opinion. Our review is de novo with regard to the issues on appeal. *See Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994).

## II. FACTUAL BACKGROUND

### A. Testimony and Statements of Abuse

The respondent is a native and citizen of Guatemala. She married at age 16. Her husband was then 21 years old. He currently resides in Guatemala, as do their two children. Immediately after their marriage, the respondent and her husband moved to Guatemala City. From the beginning of the marriage, her husband engaged in acts of physical and sexual abuse against the respondent. He was domineering and violent. The respondent testified that her husband "always mistreated me from the moment we were married, he was always . . . aggressive."

Her husband would insist that the respondent accompany him wherever he went, except when he was working. He escorted the respondent to her workplace, and he would often wait to direct her home. To scare her, he would tell the respondent stories of having killed babies and the elderly while he served in the army. Oftentimes, he would take the respondent to cantinas where he would become inebriated. When the respondent would complain about his drinking, her husband would yell at her. On one occasion, he grasped her hand to the point of pain and continued to drink until he passed out. When she left a cantina before him, he would strike her. As their marriage proceeded, the level and frequency of his rage increased concomitantly with the seeming senselessness and irrationality of his motives. He dislocated the respondent's jaw bone when her menstrual period was 15 days late. When she refused to abort her 3- to 4-month-old fetus, he kicked her violently in her spine. He would hit or kick the respondent "whenever he felt like it, wherever he happened to be:  in the house, on the street, on the bus."  The respondent stated that "[a]s time went on, he hit me for no reason at all."

The respondent's husband raped her repeatedly. He would beat her before and during the unwanted sex. When the respondent resisted, he would accuse her of seeing other men and threaten her with death. The rapes occurred "almost daily," and they caused her severe pain. He passed on a sexually transmitted disease to the respondent from his sexual relations outside their marriage. Once, he kicked the respondent in her genitalia, apparently for no reason, causing the respondent to bleed severely for 8 days. The respondent suffered the most severe pain when he forcefully sodomized her. When she protested, he responded, as he often did, "You're my woman, you do what I say."

The respondent ran away to her brother's and parents' homes, but her husband always found her. Around December 1994, the respondent attempted to flee with her children outside the city, but her husband found her again. He appeared at her door, drunk, and as she turned to leave, he struck her in the back of her head causing her to lose consciousness. When

she awoke, he kicked her and dragged her by her hair into another room and beat her to unconsciousness.

After 2 months away, her husband pleaded for the respondent's return, and she agreed because her children were asking for him. One night, he woke the respondent, struck her face, whipped her with an electrical cord, pulled out a machete and threatened to deface her, to cut off her arms and legs, and to leave her in a wheelchair if she ever tried to leave him. He warned her that he would be able to find her wherever she was. The violence continued. When the respondent could not give 5,000 quetzales to him when he asked for it, he broke windows and a mirror with her head. Whenever he could not find something, he would grab her head and strike furniture with it. Once, he pistol-whipped her. When she asked for his motivation, he broke into a familiar refrain, "I can do it if I want to."

Once, her husband entered the kitchen where the respondent was and, for no apparent reason, threw a machete toward her hands, barely missing them. He would often come home late and drunk. When the respondent noted his tardiness, he punched her. Once, he asked where the respondent had been. When she responded that she had been home waiting for him, he became enraged, struck her face, grabbed her by her hair, and dragged her down the street. One night, the respondent attempted to commit suicide. Her husband told her, "If you want to die, go ahead. But from here, you are not going to leave."

When asked on cross-examination, the respondent at first indicated that she had no opinion of why her husband acted the way he did. She supposed, however, that it was because he had been mistreated when he was in the army and, as he had told her, he treated her the way he had been treated. The respondent believed he would abuse any woman who was his wife. She testified that he "was a repugnant man without any education," and that he saw her "as something that belonged to him and he could do anything he wanted" with her.

The respondent's pleas to Guatemalan police did not gain her protection. On three occasions, the police issued summons for her husband to appear, but he ignored them, and the police did not take further action. Twice, the respondent called the police, but they never responded. When the respondent appeared before a judge, he told her that he would not interfere in domestic disputes. Her husband told the respondent that, because of his former military service, calling the police would be futile as he was familiar with law enforcement officials. The respondent knew of no shelters or other organizations in Guatemala that could protect her. The abuse began "from the moment [they] were married," and continued until the respondent fled Guatemala in May 1995. One morning in May 1995, the respondent decided to leave permanently. With help, the respondent was able to flee Guatemala, and she arrived in Brownsville, Texas, 2 days later.

A witness, testifying for the respondent, stated that she learned through

the respondent's sister that the respondent's husband was "going to hunt her down and kill her if she comes back to Guatemala."

We struggle to describe how deplorable we find the husband's conduct to have been.

## B. Country Conditions

Dr. Doris Bersing testified that spouse abuse is common in Latin American countries and that she was not aware of social or legal resources for battered women in Guatemala. Women in Guatemala, according to Dr. Bersing, have other problems related to general conditions in that country, and she suggested that such women could leave abusive partners but that they would face other problems such as poverty. Dr. Bersing further testified that the respondent was different from other battered women she had seen in that the respondent possessed an extraordinary fear of her husband and her abuse had been extremely severe.

Dr. Bersing noted that spouse abuse was a problem in many countries throughout the world, but she said it was a particular problem in Latin America, especially in Guatemala and Nicaragua. As we understand her testimony, its roots lie in such things as the Latin American patriarchal culture, the militaristic and violent nature of societies undergoing civil war, alcoholism, and sexual abuse in general. Nevertheless, she testified that husbands are supposed to honor, respect, and take care of their wives, and that spouse abuse is something that is present "underground" or "underneath in the culture." But if a woman chooses the wrong husband her options are few in countries such as Guatemala, which lack effective methods for dealing with the problem.

The Department of State issued an advisory opinion as to the respondent's asylum request. The opinion states that the respondent's alleged mistreatment could have occurred given its understanding of country conditions in Guatemala. The opinion further indicates:

> [S]pousal abuse complaints by husbands have increased from 30 to 120 a month due to increased nationwide educational programs, which have encouraged women to seek assistance. Family court judges may issue injunctions against abusive spouses, which police are charged with enforcing. The [Human Rights Ombudsman] women's rights department and various non-governmental organizations provide medical and legal assistance.

The respondent has submitted numerous articles and reports regarding violence against women in Guatemala and other Latin American countries. One article, prepared by Canada's Immigration and Refugee Board, indicates that Guatemala has laws against domestic violence, that it has taken some additional steps recently to begin to address the problem, and that "functionaries" in the legal system tend to view domestic violence as a vio-

lation of women's rights. Nevertheless, the article indicates that Guatemalan society still tends to view domestic violence as a family matter, that women are often not aware of available legal avenues, and that the pursuit of legal remedies can often prove ineffective.

## III. IMMIGRATION JUDGE'S DECISION

The Immigration Judge found the respondent to be credible, and she concluded that the respondent suffered harm that rose to the level of past persecution. The Immigration Judge also held that the Guatemalan Government was either unwilling or unable to control the respondent's husband. The balance of her decision addressed the issue of whether the respondent's harm was on account of a protected ground.

The Immigration Judge first concluded that the respondent was persecuted because of her membership in the particular social group of "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination." She found that such a group was cognizable and cohesive, as members shared the common and immutable characteristics of gender and the experience of having been intimately involved with a male companion who practices male domination through violence. The Immigration Judge then held that members of such a group are targeted for persecution by the men who seek to dominate and control them.

The Immigration Judge further found that, through the respondent's resistance to his acts of violence, her husband imputed to the respondent the political opinion that women should not be dominated by men, and he was motivated to commit the abuse because of the political opinion he believed her to hold.

## IV. ARGUMENTS ON APPEAL

On appeal, the Service argues that "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination" is not a particular social group, and that the respondent was not harmed because she belonged to such a group. The Service also contends that the respondent's husband did not persecute the respondent because of an imputed political opinion.

The respondent's brief supports the Immigration Judge's conclusions and advances additional arguments. The Refugee Law Center and the International Human Rights and Migration Project filed a joint amicus curiae brief. The thorough and well-prepared amicus brief argues that the Immigration Judge's decision is supported not only by United States asy-

lum law, but also by international human rights laws, and that the respondent's asylum claims should be analyzed against the fundamental purpose of refugee law: to provide surrogate international protection when there is a fundamental breakdown in state protection resulting in serious human rights violations tied to civil and political status.

## V. THE LAW

An asylum applicant bears the burden of proof and persuasion of showing that he or she is a refugee within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994), to be eligible for asylum under section 208(a) of the Act. The term "refugee" refers to:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Section 101(a)(42)(A) of the Act; , 480 U.S. 421, 441 (1987).

We have held that members of a particular social group share a "common, immutable characteristic" that they either cannot change, or should not be required to change because such characteristic is fundamental to their individual identities. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Matter of H-,* 21 I&N Dec. 337 (BIA 1996); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The United States Court of Appeals for the Ninth Circuit, the circuit within which this case arises, defines a particular social group as:

> a collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which impart some common characteristic that is fundamental to their identity as a member of that discrete social group.

*Sanchez-Trujillo v. INS,* 801 F.2d 1571, 1576 (9th Cir. 1986); *see also Li v. INS,* 92 F.3d 985 (9th Cir. 1996); *De Valle v. INS*, 901 F.2d 787 (9th Cir. 1990).

The asylum applicant bears the burden of providing evidence, either direct or circumstantial, from which it is reasonable to conclude that her persecutor harmed her at least in part because of a protected ground. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992); *Matter of T-M-B-,* 21 I&N Dec. 775 (BIA 1997), *petition granted and remanded sub nom. Borja v. INS, 175* F.3d *732* (9th Cir. Apr. 30, 1999). The Court in *Elias-Zacarias*

pointed out that overcoming or punishing a protected characteristic of the victim, and not the persecutor's own generalized goals, must be the motivation for the persecution. *INS v. Elias-Zacarias, supra*, at 482 ("The ordinary meaning of the phrase 'persecution on account of . . . political opinion' . . . is persecution on account of the *victim's* political opinion, not the persecutor's.").

In rendering her decision, the Immigration Judge relied in part on the May 26, 1995, INS Asylum Gender Guidelines. *See* Phyllis Coven, U.S. Dep't of Justice, *Considerations For Asylum Officers Adjudicating Asylum Claims From Women* (1995) ("DOJ Guidelines"). On appeal, the parties argue over the applicability and force of the DOJ Guidelines to this case. We agree with the Immigration Judge that the guidelines make clear the point, which is independently evident on this record, that the level of harm experienced by the respondent rises beyond the threshold of that required for "persecution." The DOJ Guidelines also set forth various considerations for addressing "social group" and "political opinion" questions, but they provide no definitive answers for a case such as the one before us. Specifically, we do not read the DOJ Guidelines, which are instructive but not controlling on us, as resolving the issue of whether or when past spouse abuse may qualify a female applicant as a "refugee" under United States asylum law.

Similarly, we find no definitive answer in the language of the statute. Congress envisioned that the spouse of an alien granted asylum would ordinarily be accorded derivative asylee status, if he or she was not independently eligible. Congress provided for that derivative status, if the spouse were "accompanying, or following to join," the principal applicant. *See* section 208(c) of the Act (1994). Subsequent to enactment of the basic asylum provisions of current law in 1980, Congress has created specific forms of relief, outside our refugee laws, for some women living in or escaping from abusive marriages. *See, e.g.,* section 240A(b)(2) of the Act, 8 U.S.C. § 1229b(b)(2) (Supp. II 1996) (cancellation of removal for spouses battered by a permanent resident or United States citizen); section 244(a)(3) of the Act, 8 U.S.C. § 1254(a)(3) (1994) (suspension of deportation for spouses battered by a permanent resident or United States citizen). No changes relative to battered spouses were made in the refugee definition or the asylum statute at the time of enactment of the battered spouse provisions.

The existence of derivative refugee status for spouses, as well as these nonrefugee provisions for battered spouses, raises the question whether Congress intended or expected that our immigration laws, even in the refugee and asylum context, would cover battered spouses who are leaving marriages to aliens having no ties to the United States. But we do not read the literal language of the statute actually to foreclose a construction that would accord refugee status to a battered spouse. In this case, we look principally to the facts to resolve both the "political opinion" and "social group" claims, and we do not intend any categorical rulings as to analogous social

group claims arising under any other conceivable set of circumstances. Nevertheless, in reaching our decision, we find significant guidance in assessing the operation of the "particular social group" category by looking to the way in which the other grounds in the statute's "on account of" clause operate.

## VI. ANALYSIS

As noted above, we agree with the Immigration Judge that the severe injuries sustained by the respondent rise to the level of harm sufficient (and more than sufficient) to constitute "persecution." We also credit the respondent's testimony in general and specifically her account of being unsuccessful in obtaining meaningful assistance from the authorities in Guatemala. Accordingly, we find that she has adequately established on this record that she was unable to avail herself of the protection of the Government of Guatemala in connection with the abuse inflicted by her husband. The determinative issue, as correctly identified by the Immigration Judge, is whether the harm experienced by the respondent was, or in the future may be, inflicted "on account of" a statutorily protected ground.

It is not possible to review this record without having great sympathy for the respondent and extreme contempt for the actions of her husband. The questions before us, however, are not whether some equitable or prosecutorial authority ought to be invoked to prevent the respondent's deportation to Guatemala. Indeed, the Service has adequate authority in the form of "deferred action" to accomplish that result if it deems it appropriate. Rather, the questions before us concern the respondent's eligibility for relief under our refugee and asylum laws. And, as explained below, we do not agree with the Immigration Judge that the respondent was harmed on account of either actual or imputed political opinion or membership in a particular social group.

### A. Imputed Political Opinion

The record indicates that the respondent's husband harmed the respondent regardless of what she actually believed or what he thought she believed. The respondent testified that the abuse began "from the moment [they] were married." Even after the respondent "learned through experience" to acquiesce to his demands, he still abused her. The abuse took place before she left him initially, and it continued after she returned to him. In fact, he said he "didn't care" what she did to escape because he would find her. He also hurt her before her first call to the police and after her last plea for help.

The respondent's account of what her husband told her may well reflect

914

his own view of women and, in particular, his view of the respondent as his property to do with as he pleased. It does not, however, reflect that he had any understanding of the respondent's perspective or that he even cared what the respondent's perspective may have been. According to the respondent, he told her, "You're my woman and I can do whatever I want," and "You're my woman, you do what I say." In fact, she stated that "[a]s time went on, he hit me for no reason at all," and that he "would hit or kick me whenever he felt like it."

Nowhere in the record does the respondent recount her husband saying anything relating to what he thought her political views to be, or that the violence towards her was attributable to her actual or imputed beliefs. Moreover, this is not a case where there is meaningful evidence that this respondent held or evinced a political opinion, unless one assumes that the common human desire not to be harmed or abused is in itself a "political opinion." The record before us simply does not indicate that the harm arose in response to any objections made by the respondent to her husband's domination over her. Nor does it suggest that his abusive behavior was dependent in any way on the views held by the respondent. Indeed, his senseless actions started at the beginning of their marriage and continued whether or not the respondent acquiesced in his demands. The record reflects that, once having entered into this marriage, there was nothing the respondent could have done or thought that would have spared her (or indeed would have spared any other woman unfortunate enough to have married him) from the violence he inflicted.

Nonetheless, the Immigration Judge found support for her conclusion in the Ninth Circuit's decision in *Lazo-Majano v. INS*, 813 F.2d 1432 (9th Cir. 1987), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996). In *Lazo-Majano*, the alien's husband left El Salvador because guerrillas sought him and the government distrusted him for his involvement in and resignation from a paramilitary group. *Id.* A Salvadoran military sergeant who persecuted the alien denounced her as a "subversive," even though that accusation was done cynically as a means to control the alien better. The court ruled that the alien had suffered past persecution because of the subversive status attributed to her by the sergeant. *Id.* We understand this to be the holding of the case, and it is for this proposition that the case has continued to be cited within the Ninth Circuit. *E.g., Meza-Manay v. INS,* 139 F.3d 759 (9th Cir. 1998); *Lopez-Galarza v. INS,* 99 F.3d 954 (9th Cir. 1996).

We nevertheless recognize that the conduct of the sergeant toward the alien in *Lazo-Majano* paralleled in several respects the actions of the respondent's husband toward her here. In its decision, the court observed that "if the situation is seen in its social context," the sergeant was "asserting the political opinion that a man has a right to dominate and he has persecuted [the alien] to force her to accept this opinion without rebellion."

915

*Lazo-Majano v. INS, supra*, at 1435. The court further suggested that the alien may be exposed to persecution from the sergeant because her flight could be seen as the expression of an opinion to the contrary. We have not, however, found a published Ninth Circuit case relying on this aspect of *Lazo-Majano* subsequent to the Supreme Court's ruling in *INS v. Elias-Zacarias, supra*, and we do not understand the "male domination" aspects of *Lazo-Majano* to be its actual holding.

Further, under *Elias-Zacarias*, the victim also must offer some evidence, direct or circumstantial, that it was the victim's political opinion that motivated the persecutor. *INS v. Elias-Zacarias, supra*, at 483. The respondent's husband, it seems, must have had some reason or reasons for treating the respondent as he did. And it is possible that his own view of men and women played a role in his brutality, as may have been the case with the brutality that he himself experienced and witnessed. What we find lacking in this respondent's showing, however, is any meaningful evidence that her husband's behavior was influenced at all by his perception of the respondent's opinion.

The respondent argues that, given the nature of domestic violence and sexual assaults, her husband necessarily imputed to her the view that she believed women should not be controlled and dominated by men. Even accepting the premise that he might have believed that the respondent disagreed with his views of women, it does not necessarily follow that he harmed the respondent *because* of those beliefs, rather than because of his own personal or psychological makeup coupled with his troubled perception of her actions at times. *See id.* at 482; *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) ("[T]he petitioner must prove something more than violence plus disparity of views.").

The Immigration Judge found, and the respondent argues, that her husband imputed a hostile opinion to her from her acts of resistance to his violence, and that he then punished her for that hostile opinion. The Court's ruling in *Elias-Zacarias*, however, establishes that the existence of a political opinion held by a persecutor, and actions by a victim that conflict with the demands of the persecutor, are not sufficient to require a conclusion that the persecutor seeks to harm the victim because of a contrary political opinion attributed to the victim. Both the respondent's argument and the "male domination" reasoning of *Lazo-Majano* seem to us to be akin to the analysis which the Supreme Court later did not accept as conclusive of political opinion persecution.

As we understand the respondent's rationale, it would seem that virtually any victim of repeated violence who offers some resistance could qualify for asylum, particularly where the government did not control the assailant. Under this approach, the perpetrator is presumed to impute to the victim a political opinion, in opposition to the perpetrator's authority, stemming simply from an act of resistance. Then, notwithstanding any other

motivation for the original violence, the imputed political opinion becomes the assumed basis for the infliction of more harm.

It is certainly logical and only human to presume that no victim of violence desires to be such a victim and will resist in some manner. But it is another matter to presume that the perpetrator of the violence inflicts it *because* the perpetrator believes the victim opposes either the abuse or the authority of the abuser. We do not find that the second proposition necessarily follows from the first. Moreover, it seems to us that this approach ignores the question of what motivated the abuse at the outset, and it necessarily assumes that the original motivation is no longer the basis, at least not by itself, for the subsequent harm. We are unwilling to accept a string of presumptions or assumptions as a substitute for our own assessment of the evidence in this record, particularly when the reliability of these presumptions as genuine reflections of human behavior has not been established.

As for the record here, there has been no showing that the respondent's husband targeted any other women in Guatemala, even though we may reasonably presume that they, too, did not all share his view of male domination. The respondent was unable to set forth an accurate time frame for the great majority of the incidents she described. We are thus unable in general to link the incidents to acts of resistance in a way that might tend to support the respondent's theory. Moreover, the myriad situations in which the abuse occurred and the various unsuccessful responses adopted by the respondent point strongly away from it having a genesis in her husband's perception of the respondent's political opinion. Put another way, it is difficult to conclude on the actual record before us that there is any "opinion" the respondent could have held, or convinced her husband she held, that would have prevented the abuse she experienced.

Thus, unlike the aliens in cases such as *Lazo-Majano, Lopez-Galarza*, and *Meza-Manay*, the respondent here has failed to establish that her persecutor attributed to her a political view and then harmed her *because of* that view.

## B. Particular Social Group

### 1. Cognizableness

Initially, we find that "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination" is not a particular social group. Absent from this group's makeup is "a voluntary associational relationship" that is of "central concern" in the Ninth Circuit. *Li v. INS, supra*, at 987 (rejecting as a claimed social group Chinese citizens with low economic status); *see also*

*De Valle v. INS, supra*, at 792 (rejecting as claimed social group "family members of deserters"); *Sanchez-Trujillo v. INS, supra,* at 1572 (rejecting as a claimed social group "young, working class males who have not served in the military of El Salvador").

Moreover, regardless of Ninth Circuit law, we find that the respondent's claimed social group fails under our own independent assessment of what constitutes a qualifying social group. We find it questionable that the social group adopted by the Immigration Judge appears to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever. The respondent fits within the proposed group. But the group is defined largely in the abstract. It seems to bear little or no relation to the way in which Guatemalans might identify subdivisions within their own society or otherwise might perceive individuals either to possess or to lack an important characteristic or trait. The proposed group may satisfy the basic requirement of containing an immutable or fundamental individual characteristic. But, for the group to be viable for asylum purposes, we believe there must also be some showing of how the characteristic is understood in the alien's society, such that we, in turn, may understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm.

Our administrative precedents do not require a voluntary associational relationship as a social group attribute. But we have ruled that the term "particular social group" is to be construed in keeping with the other four statutory characteristics that are the focus of persecution: race, religion, nationality, and political opinion. *Matter of Acosta, supra*. These other four characteristics are ones that typically separate various factions within countries. They frequently are recognized groupings in a particular society. The members of the group generally understand their own affiliation with the grouping, as do other persons in the particular society.

In the present case, the respondent has shown that women living with abusive partners face a variety of legal and practical problems in obtaining protection or in leaving the abusive relationship. But the respondent has not shown that "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination" is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Guatemala. The respondent has shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group.

The lack of a showing in this respect makes it much less likely that we will recognize the alleged group as a particular social group for asylum purposes, or that the respondent will be able to establish that it was her group

918

characteristic which motivated her abuser's actions. Indeed, if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's "membership" in the group to inflict the harm on the victim.

The respondent's showing fails in another respect, one that is noteworthy in terms of our ruling in *Matter of Kasinga, supra*. She has not shown that spouse abuse is itself an important societal attribute, or, in other words, that the characteristic of being abused is one that is important within Guatemalan society. The respondent has shown official tolerance of her husband's cruelty toward her. But, for "social group" purposes, she has not shown that women are expected by society to be abused, or that there are any adverse societal consequences to women or their husbands if the women are not abused. While not determinative, the prominence or importance of a characteristic within a society is another factor bearing on whether we will recognize that factor as part of a "particular social group" under our refugee provisions. If a characteristic is important in a given society, it is more likely that distinctions will be drawn within that society between those who share and those who do not share the characteristic.

Here, the respondent has proposed a social group definition that may amount to a legally crafted description of some attributes of her tragic personal circumstances. It may also be true that this description fits many other victims of spouse abuse.

In our opinion, however, the mere existence of shared descriptive characteristics is insufficient to qualify those possessing the common characteristics as members of a particular social group. The existence of shared attributes is certainly relevant, and indeed important, to a "social group" assessment. Our past case law points out the critical role that is played in "social group" analysis by common characteristics which potential persecutors identify as a basis for the infliction of harm. *Matter of Kasinga, supra; Matter of H-, supra*. But the social group concept would virtually swallow the entire refugee definition if common characteristics, coupled with a meaningful level of harm, were all that need be shown.

The starting point for "social group" analysis remains the existence of an immutable or fundamental individual characteristic in accordance with *Matter of Acosta, supra*. We never declared, however, that the starting point for assessing social group claims articulated in *Acosta* was also the ending point. The factors we look to in this case, beyond *Acosta's* "immutableness" test, are not prerequisites, and we do not rule out the use of additional considerations that may properly bear on whether a social group should be recognized in an individual case. But these factors are consistent with the operation of the other four grounds for asylum and are therefore appropriate, in our judgment, for consideration in the "particular social group" context.

On the record before us, we find that the respondent has not adequately established that we should recognize, under our law, the particular social group identified by the Immigration Judge.[2]

## 2. Nexus

Further, we cannot agree with the Immigration Judge's nexus analysis. In analyzing "particular social group" claims, our decisions, as well as those of the Ninth Circuit, in which this case arises, require that the persecution or well-founded fear of persecution be on account of, or, in other words, because of, the alien's membership in that particular social group. *See Li v. INS, supra; De Valle v. INS, supra; Sanchez-Trujillo v. INS, supra; Matter of Kasinga, supra; Matter of H-, supra; Matter of Acosta, supra.* This is reinforced by the Supreme Court's ruling in *INS v. Elias-Zacarias, supra*, at 483.

In this case, even if we were to accept as a particular social group "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination," the respondent has not established that her husband has targeted and harmed the respondent because he perceived her to be a member of this particular social group. The record indicates that he has targeted only the respondent. The respondent's husband has not shown an interest in any member of this group other than the respondent herself. The respondent fails to show how other members of the group may be at risk of harm from him. If group membership were the motivation behind his abuse, one would expect to see some evidence of it manifested in actions toward other members of the same group. *See Li v. INS, supra* (holding that even if Chinese citizens of low economic status did constitute a particular social group, the petitioner did not establish that authorities targeted members of that group); *Sanchez-Trujillo v. INS, supra* (finding that even if young, working class, urban males in El Salvador was a particular social group, the alien failed to demonstrate that the government singled out members of this group).

---

[2]Other "social group" definitions potentially covering the respondent were suggested below or in the appeal briefs, such as "Guatemalan women" and "battered spouses." We need not now address whether there are any circumstances under which the various alternative proposals might qualify as a "particular social group," as each of them fails on this record under the "on account of," or nexus, requirement of the statute, for the reasons we identify below with regard to the group adopted by the Immigration Judge.

These same "on account of" principles would cause us to part company with at least the *rationale* expressed in several of the opinions by the English House of Lords in *Islam (A.P.) v. Secretary of State for the Home Dep't*, ___ App. Cas. ___ (Mar. 25, 1999), *available in* ‹http://www.parliament.the-stationery-office.co.uk/pa/ld9899/ldjudgmt/jd990325/ islam01.htm›. We note, however, that those conjoined appeals arose in a different factual setting.

The Immigration Judge's nexus analysis fails to limit consistently the source of persecution to the respondent's husband. At one point, the Immigration Judge seems to identify all Guatemalan males who abuse their partners as the persecutors, but the record indicates that the respondent suffered and feared intimate violence only from her own husband. When the Immigration Judge correctly identifies the husband as the persecutor whom the Guatemalan Government failed to control, her nexus finding is both too broad and too narrow. It is too broad in that he did not target all (or indeed any other) Guatemalan women intimate with abusive Guatemalan men. It is too narrow in that the record strongly indicates that he would have abused any woman, regardless of nationality, to whom he was married.

Indeed, the record does not reflect that the respondent's husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala. There is little doubt that the respondent's spouse believed that married women should be subservient to their own husbands. But beyond this, we have scant information on how he personally viewed other married women in Guatemala, let alone women in general. On the basis of this record, we perceive that the husband's focus was on the respondent because she was *his* wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm.

The respondent's statements regarding her husband's motivation also undercut the nexus claims. He harmed her, when he was drunk and when he was sober, for not getting an abortion, for his belief that she was seeing other men, for not having her family get money for him, for not being able to find something in the house, for leaving a cantina before him, for leaving him, for reasons related to his mistreatment in the army, and "for no reason at all." Of all these apparent reasons for abuse, none was "on account of" a protected ground, and the arbitrary nature of the attacks further suggests it was not the respondent's claimed social group characteristics that he sought to overcome. The record indicates that there is nothing the respondent could have done to have satisfied her husband and prevented further abuse. Her own supposition is that he abused her because he was abused himself in the military.

The respondent was not at particular risk of abuse from her husband until she married him, at which point, given the nature of his focus, she was in a "group" by herself of women presently married to that particular man. Such a group, however, would fail to qualify as a "particular social group" under the Act. *See Sanchez-Trujillo v. INS, supra; Matter of Acosta, supra*.

The Immigration Judge nevertheless found, and the respondent argues on appeal, that her various possible group memberships account for her plight, in large measure because the social climate and the Government of

Guatemala afford her no protection from her husband's abuse. Societal attitudes and the concomitant effectiveness (or lack thereof) of governmental intervention very well may have contributed to the ability of the respondent's husband to carry out his abusive actions over a period of many years. But this argument takes us away from looking at the motivation of the husband and focuses instead on the failure of the government to offer protection.

Focusing on societal attitudes and a particular government's response to the infliction of injury is frequently appropriate in the adjudication of asylum cases. It is most warranted when the harm is being inflicted by elements within the government or by private organizations that target minority factions within a society. But governmental inaction is not a reliable indicator of the motivations behind the actions of private parties. And this is not a case in which it has been shown that the Government of Guatemala encourages its male citizens to abuse its female citizens, nor in which the Government has suddenly and unreasonably withdrawn protection from a segment of the population in the expectation that a third party will inflict harm and thereby indirectly achieve a governmental objective.

The record in this case reflects that the views of society and of many governmental institutions in Guatemala can result in the tolerance of spouse abuse at levels we find appalling. But the record also shows that abusive marriages are not viewed as desirable, that spouse abuse is recognized as a problem, and that some measures have been pursued in an attempt to respond to this acknowledged problem. In this context, we are not convinced that the absence of an effective governmental reaction to the respondent's abuse translates into a finding that her husband inflicted the abuse because she was a member of a particular social group. The record does not support such a conclusion, as a matter of fact, when the husband's own behavior is examined. And Guatemala's societal and governmental attitudes and actions do not warrant our declaring this to be the case as a matter of law.

The Immigration Judge's decision relies heavily on the absence of governmental protection in its finding that the respondent was targeted for harm on account of her claimed group membership. The respondent takes this even further on appeal, arguing that governments can be deemed responsible for private acts of violence against women by virtue of the failure to afford protection. She also contends that she should be considered a "refugee" simply because she is not adequately protected by her own government.

We do not know whether enforcement measures would have deterred the abusive behavior of the respondent's husband in this case. But we do know that spouse abuse takes place even in communities with strong enforcement mechanisms. Varying levels of governmental tolerance of, or vigorous enforcement measures against, abuse can reasonably be expected to affect the incidence of spouse abuse within particular communities. It does not necessarily follow, however, that antagonism toward a "particular

social group" is the motivation for the harm that husbands inflict upon their wives in those communities which afford little or no protection, even if certain societal attitudes may be seen as contributing to the absence of effective enforcement.

The adequacy of state protection is obviously an essential inquiry in asylum cases. But its bearing on the "on account of" test for refugee status depends on the facts of the case and the context in which it arises. In this case, the independent actions of the respondent's husband may have been tolerated. But, as previously explained, this record does not show that his actions represent desired behavior within Guatemala or that the Guatemalan Government encourages domestic abuse.

Importantly, construing private acts of violence to be qualifying governmental persecution, by virtue of the inadequacy of protection, would obviate, perhaps entirely, the "on account of" requirement in the statute. We understand the "on account of" test to direct an inquiry into the motives of the entity actually inflicting the harm. *See INS v. Elias-Zacarias, supra.* Further, the adoption of such an approach would represent a fundamental change in the analysis of refugee claims. We see no principled basis for restricting such an approach to cases involving violence against women. The absence of adequate governmental protection, it would seem, should equally translate into refugee status for other categories of persons unable to protect themselves.

A focus on the adequacy of governmental protection would also shift the analysis in cases of refugee claims arising from civil war, as well as any other circumstance in which a government lacked the ability effectively to police all segments of society. This is not to say that the outcome of such an analysis would necessarily yield different results. The point, however, is that the existing statutory formula for assessing refugee claims would be altered. Instead of assessing the motivation of the actual persecutor, we might, for example, be focusing on the motivation or justification of the government for not intervening and affording real protection.

We reject the approach advocated by the respondent in view of the existing statutory language and the body of case law construing it. Consequently, the respondent must show more than a lack of protection or the existence of societal attitudes favoring male domination. She must make a showing from which it is reasonable  to conclude that her husband was motivated to harm her, at least in part, by her asserted group membership.

In the end, we find that the respondent has failed to show a sufficient nexus between her husband's abuse of her and the particular social group the Immigration Judge announced, or any of the other proffered groups.

### 3. The *Kasinga* Decision

923

Our decision in *Matter of Kasinga, supra*, does not prescribe a different result. In that case, the alien belonged to the Tchamba-Kunsuntu tribe in Togo in which young women normally underwent female genital mutilation ("FGM") before the age of 15. Under tribal custom, the alien's aunt and husband planned to force her to submit to FGM before she was to be married. Following her escape from Togo, the Togolese police were looking for her. The record included a letter from a cultural anthropologist indicating that women from the Tchamba people probably would be expected to undergo FGM prior to marriage. A Department of State report in the record indicated that FGM was practiced by some Togo ethnic groups, that as many as 50% of Togolese females may have been mutilated, and that violence against women in Togo occurs with little police intervention. We held that FGM was persecution, that "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice" constitute a particular social group, that the alien was a member of such a group, and that she possessed a well-founded fear of persecution on account of her membership in that group.

In contrast to our ruling in *Matter of Kasinga, supra*, the Immigration Judge in the instant case has not articulated a viable social group. The common characteristic of not having undergone FGM was one that was identified by Kasinga's tribe, and motivated both her family and the tribe to enforce the practice on Kasinga and other young women. Indeed, the tribe expected or required FGM of women prior to marriage, signifying the importance of the practice within that tribal society. The record in *Kasinga* indicated that African women faced threats or acts of violence or social ostracization for either refusing the practice or attempting to protect female children from FGM. Moreover, although the source of Kasinga's fear of physical harm was limited to her aunt and husband, she established that FGM was so pervasive that her tribal society targeted "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice."

The respondent in this case has not demonstrated that domestic violence is as pervasive in Guatemala as FGM is among the Tchamba-Kunsuntu Tribe, or, more importantly, that domestic violence is a practice encouraged and viewed as societally important in Guatemala. She has not shown that women are expected to undergo abuse from their husbands, or that husbands who do not abuse their wives, or the nonabused wives themselves, face social ostracization or other threats to make them conform to a societal expectation of abuse. While the respondent here found no source of official protection in Guatemala, the young woman in *Kasinga* testified that the police in Togo were looking for her and would return her to her family to undergo FGM. *Matter of Kasinga, supra*, at 359.

We recognize that the respondent's situation is similar to that in *Kasinga*, in part, because the person actually inflicting the harm or feared

924

harm is a family member of the victim. While the cases bear some similarities in this regard, we do not find this to be a factor that *supports* the claim of group recognition. Rather, it is a factor to be overcome if the group is to be accepted. In the context of asylum law, persecutors typically harbor animosities *and* act on those animosities toward many persons known to have the "hated" characteristic. When action is directed toward but one individual, or toward a small number of close family members, it calls into question both the propriety of the group definition and the alleged group motivation of the persecutor.

Furthermore, we may assume for purposes of discussion that "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination" constitute a particular social group. But, the respondent has not shown that Guatemalan males who believe in male domination and have been intimate with Guatemalan women actually target their intimate partners for persecution because of the victims' presumed group membership. The proposed social group represents a description of persons who may or may not experience harm. But it fails, on this record, as an adequate explanation for the surface, or even the more deep-rooted, factors that motivate the abusive behavior.

### 4. The Dissent

We find the dissent's analysis unconvincing, largely for the reasons we have already set forth in arriving at our decision. We shall thus confine our observations to the dissent's nexus arguments.

As the dissent correctly recognizes, we have granted relief in asylum cases where we have found it reasonable to believe that harm was inflicted, at least in part, because of a protected ground. *E.g., Matter of S-P-,* 21 I&N Dec. 486 (BIA 1996). The dissent believes that the respondent's husband abused her, at least in part,  because of an actual or imputed political opinion or because of her membership in a social group. It draws this conclusion from the cultural and societal context in which the abuse occurred, from literature indicating that domestic violence represents an exercise of power and domination over women, from her husband's view of her as his property, from the egregious nature of the harm, and from the absence of a legitimate motive for the abuse. We, on the other hand, do not find it reasonable to believe that an actual or imputed political opinion or social group membership led even in part to the respondent's abuse.

At the outset, the respondent never testified that she understood the abuse to be motivated by her political opinion or membership in a group of any description. Her husband never articulated such motivation, and she does not seem to have perceived it independent of the legal arguments now being advanced on her behalf. The dissent itself does not claim that either

the respondent or her husband understood the abuse to be motivated, even in part, by the respondent's political opinion or social group membership.

In this context, the dissent's arguments for a political or social group motivation seem artificial. In our judgment, asylum law is not simply about the construction of various presumptions and inferences for bringing inarguably atrocious human action within one of the five grounds for which relief may be granted, particularly when those presumed or inferred motivations are undetected by both the abuser and the victim. For example, the perpetrators and victims of persecution because of race, religion, and political opinion typically understand and can explain the societal hatreds that lead to the harm or feared harm. We find it very difficult to accept the proposition that a persecutor targets persons who qualify as refugees for reasons that neither the persecutor nor the victims have been shown to understand as playing any role in the persecution.

In *Matter of S-P-, supra*, for example, we found that it was reasonable to believe that imputed political opinion played a role in the harm suffered by a person captured during a military operation and suspected of being a member of an armed opposition force in a civil war context. The political aspects of the conflict itself were readily apparent, and the participants on both sides well understood the conflict to have a significant political dimension. We were not required to presume the existence of a motivating factor that escaped recognition by any of the parties to the civil war. Our inquiry was simply to determine whether it was reasonable to believe that a known motivating factor in the existing conflict had actually contributed to the particular prisoner's torture.

In the case now before us, it simply has not been shown that political opinion or social group membership can reasonably be understood as the motivation behind the spouse abuse. Other factors, ranging from jealousy to growing frustration with his own life to simple unchecked violence tied to the inherent meanness of his personality, are among the explanations or motivations that may reasonably be inferred on this record for the actions of the respondent's husband. For example, when the respondent resisted her husband's demands for sexual relations, he would accuse her of seeing other men. Notably, he did not accuse her of harboring opinions hostile to his own or of being part of an abhorrent group.

The dissent also relies on the impunity with which the respondent's husband acted as support for its "on account of" conclusions. In this regard, it draws on the opinion of Lord Hoffman in *Islam (A.P.) v. Secretary of State for the Home Dep't,* ___ App. Cas. (March 25, 1999), *available in* ‹http://www.parliament.the-stationery-office.co.uk/pa/ld9899/ldjudgmt/jd990325/islamp1.htm›, which argues that a Jewish business-man attacked by an Aryan competitor in Nazi Germany would be a victim of persecution on account of race because of the failure of the authorities to provide protection, even though the competitor was personally moti-

vated only by business rivalry. But the very point of this example was to shift the focus away from the motivation of the entity causing the harm and to focus instead on governmental discrimination as satisfying the causation or nexus element for refugee status. Indeed, it does not appear that Lord Hoffman's nexus argument would be any different if the business competitor inflicting the harm had also been Jewish. The dissent's argument, consequently, is a variant of the respondent's claim that she should be accorded refugee status simply because she was not adequately protected by her government. We are not persuaded by this argument in the context of this case for the reasons we set forth earlier in addressing the respondent's contention.

We do agree with the dissent that the reasons set forth by the respondent's husband obviously do not in any way justify the abuse. But we find the lack of legitimate motives, an unconscionable level of harm, the escalation of the harm over time, and even the very incomprehensibleness of the abuse to be an inadequate basis from which to infer a statutorily qualifying motive. It is the respondent who bears the burden of proof. The dissent's approach, however, would seem effectively to shift the burden to the Service, as it would presume the existence of a qualifying case arising from serious harm and the absence of any apparently legitimate motive. We understand such an approach to free an asylum applicant of the need to offer evidence of motivation (as a qualifying motive would be presumed), and instead to force the Service to offer evidence of a "legitimate" reason for the infliction of the harm. In our judgment, it remains for the respondent to establish an evidentiary record from which we may reasonably infer that a qualifying motive led, at least in part, to the harm she suffered, and this she has failed to do.

## VII. CONCLUSION

In sum, we find that the respondent has been the victim of tragic and severe spouse abuse. We further find that her husband's motivation, to the extent it can be ascertained, has varied; some abuse occurred because of his warped perception of and reaction to her behavior, while some likely arose out of psychological disorder,  pure meanness, or no apparent reason at all. Absent other evidence, we accept the respondent's own assessment that the foundations of the abuse she suffered lay in the abuse her husband had experienced in his own life. We are not persuaded that the abuse occurred because of her membership in a particular social group or because of an actual or imputed political opinion. We therefore do not find the respondent eligible for asylum, and consequently, she is ineligible for withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994). *See INS v. Cardoza-Fonseca, supra.*

The respondent in this case has been terribly abused and has a genuine and reasonable fear of returning to Guatemala. Whether the district director may, at his discretion, grant the respondent relief upon humanitarian grounds—relief beyond the jurisdiction of the Immigration Judge and this Board—is a matter the parties can explore outside the present proceedings. We further note that Congress has legislated various forms of relief for abused spouses and children. The issue of whether our asylum laws (or some other legislative provision) should be amended to include additional protection for abused women, such as this respondent, is a matter to be addressed by Congress. In our judgment, however, Congress did not intend the "social group" category to be an all-encompassing residual category for persons facing genuine social ills that governments do not remedy. The solution to the respondent's plight does not lie in our asylum laws as they are currently formulated.

## VIII. DEPORTABILITY AND VOLUNTARY DEPARTURE

On the basis of the respondent's admissions, the Immigration Judge found the respondent deportable as an alien who entered without inspection. This finding is not challenged on appeal. In its September 1996, post-hearing brief before the Immigration Judge, the Service expressed its view that the respondent is statutorily eligible for voluntary departure and that it did not object to a grant of that relief. Accordingly, we will grant the respondent 30 days' voluntary departure. The respondent elected not to designate a country of deportation. Guatemala will be specified as the country of deportation pursuant to the Immigration Judge's determination at the December 7, 1995, hearing session.

Accordingly, the appeal will be sustained, and the respondent will be granted voluntary departure.

**ORDER:** The appeal of the Immigration and Naturalization Service is sustained and the Immigration Judge's order of September 20, 1996, is vacated.

**FURTHER ORDER:** In lieu of an order of deportation the respondent is allowed to depart voluntarily, without expense to the Government, within 30 days from the date of this order or any extension beyond that time as may be granted by the district director and under such conditions as he may direct. In the event of the respondent's failure so to depart, the respondent shall be deported to Guatemala.

Board Member Lori Scialabba did not participate in the decision in this case.

*DISSENTING OPINION:* John Guendelsberger, Board Member, in which

Paul W. Schmidt, Chairman; Gustavo D. Villageliu, Lory Diana Rosenberg, and Anthony C. Moscato, Board Members, joined

I respectfully dissent. I agree with the thorough and well-reasoned decision of the Immigration Judge that the respondent has demonstrated past persecution and a well-founded fear of future persecution based on her membership in a particular social group and upon her express and imputed political opinion.[1]

## I. ISSUES PRESENTED

This case presents two questions: (1) whether a woman trapped in a long-term relationship with an abusive spouse, in a country in which such abuse is tolerated by society and ignored by governmental officials, is a member of a particular social group entitled to the protection of asylum law; and, (2) whether the domestic abuse in the instant case was at least partially motivated by an actual or imputed political opinion.

## II. OVERVIEW

This is not merely a case of domestic violence involving criminal conduct. The respondent's husband engaged in a prolonged and persistent pattern of abuse designed to dominate the respondent and to overcome any effort on her part to assert her independence or to resist his abuse. His mistreatment and persecution of her in private and in public was founded, as the majority states, on his view that it was his right to treat his wife as "his property to do as he pleased." He acted with the knowledge that no one would interfere. His horrific conduct, both initially and in response to her opposition to it, was not that of an individual acting at variance with societal norms, but one who recognized that he was acting in accordance with them.

The harm to the respondent occurred in the context of egregious governmental acquiescence. When the respondent sought the aid and assistance of government officials and institutions, she was told that they could do nothing for her. This is not a case in which the government tried, but failed, to afford protection. Here the government made no effort and showed no interest in protecting the respondent from her abusive spouse. Thus, when the respondent went to the police or to the court to seek relief from threats,

---

[1]The briefs of amici curiae, the Refugee Law Center and the International Human Rights/Migration Projects, and the respondent's brief to the Board also provide persuasive arguments in support of the Immigration Judge's decision.

physical violence, broken bones, rape, and sodomy inflicted by her husband, Guatemalan police officials and the judge refused to intervene.

The record confirms the Immigration Judge's finding that in Guatemala there are "institutional biases against women that prevent female victims of domestic violence from receiving protection from their male companions or spouses." The Immigration Judge found that these institutional biases "appear to stem from a pervasive belief, common in patriarchal societies, that a man should be able to control a wife or female companion by any means he sees fit: including rape, torture, and beatings." Because of the principle that men should control women with whom they are intimately involved and the belief that domestic abuse is a family matter in which others must not intervene, women are not protected when they complain of domestic violence, and men who inflict such violence are not prosecuted. The respondent's husband told her that because of his connections to the miliary, the police and courts would not support her against him, and consistent with his threats, when she sought governmental intervention, her pleas fell on deaf ears and she was told she could not divorce him because her husband's consent was needed. No one, neither society nor the government, was able or willing to protect the respondent from her husband.

The majority's insistence that the respondent's husband was not motivated to harm her, "even in part, because of her membership in a particular social group or because of an actual or imputed political opinion," cannot be reconciled either with the reality of the respondent's situation in Guatemala, or with United States law. *Matter of R-A-,* 22 I&N Dec. 3403, at 2 (BIA 1999). It is at odds with our own precedent, federal court authority, and Department of Justice policy pronouncements, which effectuate our obligation to provide surrogate protection for persons who fear harm inflicted because of some fundamental aspect of their identity.


### III. PERSECUTION ON ACCOUNT OF MEMBERSHIP IN A PARTICULAR SOCIAL GROUP

The respondent has been harmed in the past and possesses a well-founded fear of harm in the future "on account of . . . membership in a particular social group." Section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994). The majority proposes a laundry list of hurdles to be cleared before she may demonstrate membership in a particular social group. This stringent approach to asylum law disregards decisions of tribunals, both domestic and foreign, which extend asylum protection to women who flee human rights abuses within their own homes. It also ignores international human rights developments and the guiding principle of the Charter of the United Nations, the Universal Declaration of Human Rights, and the 1951 Convention Relating to the

Status of Refugees, "that human beings shall enjoy fundamental rights and freedoms without discrimination." United Nations Convention Relating to the Status of Refugees, preamble, *adopted* July 28, 1951, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention"). The respondent has a fundamental right to protection from abuse based on gender. When domestic abuse based on gender occurs, as here, with state acquiescence, the respondent should be afforded the protection of asylum law.

### A. The Immigration Judge's Finding of a Particular Social Group is Consistent With Board Precedent

The Immigration Judge found that the respondent was a member of a social group comprised of "Guatemalan women, who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination." In so finding, she carefully analyzed the facts of the case and correctly applied the law as set forth in *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987), and, most recently, in *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996).

We first set forth the requirements for a particular social group in *Matter of Acosta, supra*. There we interpreted the phrase "membership in a particular social group" in a manner consistent with the other enumerated grounds for asylum. As each of the other grounds (race, religion, nationality, and political opinion) refers to a common, immutable characteristic which a person either cannot change, or should not be required to change, because it is "fundamental to individual identity or conscience," we determined that the phrase "particular social group" also should be defined by this type of characteristic. *Id.* at 233. The shared immutable characteristic "might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership." *Id.* We concluded that such determinations must be made on a case-by-case basis. Applying this test to the record in *Acosta*, we found that members of a taxi cooperative and persons engaged in the transportation industry of El Salvador did not constitute a particular social group, because the characteristics defining the group were not immutable. Members of the group could avoid the threats from the guerrillas either by changing jobs or by cooperating in work stoppages. *Id.* at 234.

Under *Acosta*, then, immutability is of the essence. In a number of decisions, we have applied the *Acosta* immutability standard to recognize particular social groups. In each case, we recognized an immutable trait or past experience shared by the members of the social group. The shared past experience of former members of the national police force in El Salvador, for example, has been recognized as an immutable characteristic which

931

makes such individuals members of a particular social group for asylum purposes. *Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988). Similarly, gay men and lesbians in Cuba have been found to constitute a particular social group. *Matter of Toboso-Alfonso*, 20 I&N Dec. 819 (BIA 1990). Members of the Darood clan and Marehan subclan in Somalia have been found to share immutable characteristics required for social group recognition, *Matter of H-,* 22 I&N Dec. 337 (BIA 1996), as have Filipinos of Chinese ancestry, *Matter of V-T-S-*, Interim Decision 3308 (BIA 1997).

In *Matter of Kasinga, supra*, a case involving a young Togolese woman who fled her country to avoid the practice of female genital mutilation practiced by her tribe, we considered a social group partly defined by gender. We found that the applicant had a well-founded fear of persecution based on her membership in the social group of young women of the Tchamba-Kunsuntu tribe who have not been mutilated and who oppose the practice. In so holding, we ruled that Ms. Kasinga's gender and ethnic affiliation were characteristics she could not change, and the characteristic of having intact genitalia was so fundamental that she should not be required to change it. *Id.* at 366.

The Immigration Judge decided the case before her consistent with our precedent decision in *Kasinga*. In both cases, the social group was defined by reference to gender in combination with one or more additional factors. In *Kasinga*, the social group was defined by gender, ethnic affiliation, and opposition to female genital mutilation ("FGM"). In the instant case, the social group is based on gender, relationship to an abusive partner, and opposition to domestic violence. As the Immigration Judge below correctly observed, the respondent's relationship to, and association with, her husband is something she cannot change. It is an immutable characteristic under the *Acosta* guidelines, which we affirmed in *Kasinga*. *Id.* at 366.

There are a number of other striking similarities between the instant case and *Kasinga*. Both cases involve a form of persecution inflicted by private parties upon family members. In both cases, the victims opposed and resisted a practice which was ingrained in the culture, broadly sanctioned by the community, and unprotected by the state. In both cases, the overarching societal objective underlying the cultural norm was the assurance of male domination. Kasinga lost the protection of her father when he died; Kasinga experienced strong indicators (i.e., her forced marriage to a polygamist) that she would be forced to undergo the procedure in the future; and Kasinga was unable to escape her own ethnicity and live within another tribal society within Togo. *See Matter of Kasinga, supra*. In the instant case, the respondent lost the protection of her family when, at the age of 15, she married her would-be persecutor; the harm suffered by the respondent in the past is a clear indicator that the harm would continue in the future, and perhaps become more severe; and, finally, the respondent was unable, within the borders of Guatemala, to obtain governmental protection from her per-

932

secutor.

In attempting to distinguish this case from *Kasinga,* the majority contends that domestic violence in Guatemala, unlike FGM in Togo, is not so pervasive or "societally important" that the respondent will face "social ostracization" for refusing to submit to the harm. The majority's distinction is flawed. The facts of *Kasinga* did not suggest that Kasinga would face severe social ostracization for her refusal to submit to FGM; rather, as a member of a social group defined by her unique circumstances, she faced harm only because she lost the protection of her father. In *Kasinga*, a family member, Kasinga's aunt, targeted her after the death of her father who, as the primary authority figure in her family, had previously protected her from FGM. In other words, the practice was not so pervasive in Togo that her father, also a member of the ethnic group which had targeted her, had been unable to identify the practice as harmful. Some persons within Togo viewed FGM as an acceptable practice; other persons, even those within the same ethnic group (such as Kasinga's father, mother, and sister), did not. We extended asylum protection to Kasinga not because she faced societal ostracization, but because she demonstrated a well-founded fear of harm on account of her membership in a group composed of persons sharing her specific circumstances.

In the end, there are no meaningful distinctions that justify recognizing the social group claim in *Kasinga* while refusing to recognize such a social group claim in the instant case. The gender-based characteristics shared by the members of each group are immutable, the form of abuse resisted in both cases was considered culturally normative and was broadly sanctioned by the community, and the persecution imposed occurred without possibility of state protection.

## B. The Instant Case Involves More Than Mere Membership in a Statistical Group

The finding of the United States Court of Appeals for the Ninth Circuit in *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1573 (9th Cir. 1986), that "young, urban, working class males of military age who had never served in the military or otherwise expressed support for the government of El Salvador" were not members of a particular social group because they lacked a "voluntary associational relationship," does not compel a different conclusion.

First, the instant case does not involve the type of all-encompassing grouping posited in *Sanchez-Trujillo*, which arose in the context of countrywide civil strife and anarchy. Here, the circumstances of group members who share the immutable traits of gender and a relationship to an abusive partner are distinct from those of other members of society who may fear general civil strife, criminal assault or other social disorder.

933

Second, the considerations of "close affiliation," "common impulse or interest," and "voluntary associational relationship" in *Sanchez-Trujillo* were posited in response to a proposed social group of young men who were unable to demonstrate that their common fears were related to any shared risk factors. The court, noting the speculative nature of the claim, drew a comparison with political opinion cases, and explicitly stated that "what constitutes a 'particular social group,' as opposed to a mere demographic division of the population, *must be independently determined through the application of the statutory term in a particular context.*" *Id.* at 1576 n.7 (emphasis added). This approach does not consist of a mechanical application of the *Sanchez-Trujillo* "voluntariness" inquiry, but an independent contextual determination.

Indeed, where warranted (i.e., in cases where the basis for the asylum claim is "mere membership" in a sweeping demographic wedge of the general population), the court has inquired into the "voluntariness" of the association with other members of that group.[2] *See, e.g., Li v. INS*, 92 F.3d 985, 987 (9th Cir. 1996) (rejecting a claim that Chinese citizens of low economic status constitute a particular social group); *De Valle v. INS*, 901 F.2d 787, 792 (9th Cir. 1990) (rejecting a group described as "family members of deserters" from the Salvadoran Army where neither past harm nor an individual targeting of the applicant or her family member had been demonstrated). In contrast, the court has analyzed other social group claims without reference to "voluntariness." *See, e.g., Velarde v. INS, 140 F.3d 1305* (9th Cir. 1998) (remanding the case to the Board for consideration of a claim based on status as a former presidential bodyguard on the basis of either imputed political opinion or membership in a particular social group); *Aruta v. INS*, 80 F.3d 1389, 1395 (9th Cir. 1996) (rejecting claim for nexus reasons, but recognizing a family member of a former military police officer as a cognizable social group under the Act).

In addition, in the intervening decade since *Sanchez-Trujillo* was decided, most courts outside the Ninth Circuit have applied *Acosta's* immutability standard, rather than a "voluntariness" standard, in deciding whether a group is cognizable under the Act. *See, e.g., Lwin v. INS*, 144 F.3d 505, 511-12 (7th Cir. 1998) (adopting *Acosta* standard in accepting a group described

---

[2]Likewise, in political opinion cases where a claimant does not demonstrate individualized harm, the Ninth Circuit has regularly imposed a heightened evidentiary burden. *See, e.g., Prasad v. INS*, 47 F.3d 336, 340 (9th Cir. 1995) ("Particularized individual persecution, not merely conditions of discrimination in the country of origin, must be shown before asylum will be granted."); *Kotasz v. INS*, 31 F.3d 847, 852 (9th Cir. 1994) (discussing the requirement that an alien demonstrate that he faces a particularized threat of persecution using "various formulations"); *Arteaga v. INS,* 836 F.2d 1227, 1232 n.9 (9th Cir. 1988) (distinguishing social group claims based on "membership" from those claims involving "individual persecution"). That the respondent's harm is particularized is beyond doubt for the instant case.

as "parents of Burmese student dissidents"). The First and Third Circuits have also endorsed the immutability/fundamental identity approach in determining what constitutes a particular social group. *See Fatin v. INS*, 12 F.3d 1233, 1239-41 (3d Cir. 1993) (observing that an Iranian woman who refused to conform to the Iranian Government's gender-specific laws and social norms may well satisfy the *Acosta* definition "simply because she [was] a woman"); *Ananeh-Firempong v. INS*, 766 F.2d 621 (1st Cir. 1985) (noting that individuals associated with the former government of Ghana could comprise a social group because their fears arose from characteristics beyond their power to change); *see also Meguenine v. INS*, 139 F.3d 25, 28 n.2 (1st Cir. 1998) (approving a social group definition that requires "some immutable trait (such as an ethnic group) or a mutable trait which a member of that group should not, in good conscience, be required to change (such as a religious adherent's beliefs)").

Although the Eighth Circuit Court of Appeals acknowledged the *Sanchez-Trujillo* approach in *Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994), concluding that a group comprised of all Iranian women was too broad to constitute a particular social group, the court noted its agreement with the Third Circuit's observation in *Fatin v. INS, supra*, in stating that "a group of women, who refuse to conform and whose opposition is so profound that they would choose to suffer the severe consequences of noncompliance," may well qualify as a particular social group. *See also Fisher v. INS,* 79 F.3d 955, 966 (9th Cir. 1996) (Canby, J., concurring) (noting that it remains an open question in the Ninth Circuit "whether persecution of women because they are women is a ground for asylum under the Act").

Social groups may be defined more or less broadly depending upon the level of generality of the defining characteristics. In the instant case, the Immigration Judge used a fairly precise and narrow focus. She could have legitimately broadened the perspective to include all Guatemalan women or, possibly, all married Guatemalan women as the particular social group. See, in this regard, the discussion in *Islam (A.P.) v. Secretary of State for the Home Dep't,* ___ App. Cas. ___ (Mar. 25, 1999), *available in* ‹http://www.parliament.the-stationery-office.co.uk/pa/ld9899/ldjudgmt/jd990325/islam01.htm›, (opinion of Lord Steyn, recognizing a particular social group consisting of all Pakistani women and, in the alternative, a particular social group consisting of women suspected by their husbands of adultery who would be unprotected by the Government of Pakistan). Whether defined broadly or narrowly, an independent contextual evaluation of the respondent's claim in the instant case demonstrates a particular social group.

### C. Gender-Related Social Group Claims, Like Those Involving Race, Religion, Nationality, and Political Opinion,

**Implicate Fundamental Human Rights**

The international community has recognized that gender-based violence, such as domestic violence, is not merely a random crime or a private matter; rather, such violence is a violation of fundamental human rights. In recognition of the special issues confronting female victims of violence, international bodies have responded accordingly. *See, e.g., Declaration on the Elimination of Violence Against Women*, G.A. Res. 48/104, U.N. GAOR, 48th Sess., Agenda Item 111, U.N. Doc. A/Res/48/104 (1994) (recognizing violence against women as human rights violation); *Conclusions on the International Protection of Refugees*, U.N. High Commissioner for Refugees, 36th Sess., No. 39(k) (1985) (recognizing that women in certain situations qualify for asylum based on membership in gender-based social groups).[3]

Domestic bodies have also responded. The Department of Justice has addressed asylum claims involving violence against women in guidelines promulgated in 1995. *See* Phyllis Coven, U.S. Dep't of Justice, *Considerations for Asylum Officers Adjudicating Claims from Women* (1995) ("DOJ Guidelines"). The DOJ Guidelines announce the principle that "women's rights are human rights, and women's rights are universal." *Id.* at 2. They explicitly state that "rape . . . sexual abuse and domestic violence, infanticide and genital mutilation are forms of mistreatment primarily directed at girls and women and they may serve as evidence of past persecution on account of one or more of the five grounds." *Id.* at 4. The DOJ Guidelines advise that claims to asylum should be analyzed against the background of the fundamental purpose of refugee law: to provide surrogate international protection where there is a fundamental breakdown in state protection. The DOJ Guidelines go on to state that domestic violence exemplifies just such a breakdown:

> [T]his principle becomes crucial where the applicant alleges private actions—*such as domestic violence*—that the state will not protect against. In such situations, the officer must explore the extent to which the government can or does offer protection or redress resulting in serious human rights violations tied to civil and political status.

---

[3]*The Convention on the Elimination of All Forms of Discrimination Against Women*, G.A. Res. 34/180, U.N. GAOR, 34th Sess., Agenda Item 75, U.N. Doc. A/Res/34/180 (1980), prohibits discrimination against women and requires states to take affirmative steps to eliminate discriminatory treatment of women by both state and private actors. The *Declaration on the Elimination of Violence Against Women,* G.A. Res. 48/104, U.N. GAOR, 48th Sess., Agenda Item 111, U.N. Doc. A/Res/48/104 (1994), recognizes violence against women, in both public and private life, as both a per se violation of human rights and as an impediment to the enjoyment by women of other human rights and fundamental freedoms, and specifically condemns domestic violence as a violation of human rights.

DOJ Guidelines, *supra*, at 16 (emphasis added). The DOJ Guidelines explicitly state that "the evaluation of gender-based claims must be viewed within the framework provided by existing international human rights instruments and the interpretation of those instruments by international organizations." *Id.* These statements are persuasive evidence that our asylum laws, as they are currently formulated, provide a sound basis for providing protection to this respondent.

Canada has promulgated similar guidelines. *See* Immigration and Refugee Board of Canada, *Guideline 4: Women Refugee Claimants Fearing Gender-Related Persecution: Update* 3 (1996). Moreover, Canadian appellate courts have extended protection to a victim of domestic violence on the basis of her membership in a particular social group. In *Mayers v. Canada*, 97 D.L.R.4th 729 (C.A. 1992), the Canadian Court of Appeals recognized a social group defined as "Trinidadian women subject to wife abuse." In overturning the decision by the Refugee Division, the court emphasized the need to look to "foreign jurisprudence and learned commentary" in order to construe the phrase "membership in a particular social group," and it cited scholarly work critical of the *Sanchez-Trujillo* court's failure to look to principles of international law.

More recently, in conjoined appeals involving women seeking asylum protection in the United Kingdom for domestic violence in Pakistan, the House of Lords found "women in Pakistan" to constitute a particular social group under the Convention's refugee definition, *Islam (A.P.) v. Secretary of State for the Home Dep't, supra*. Lord Steyn found "women in Pakistan" to be a "logical application of the seminal reasoning" of *Acosta*. Lord Hoffman recognized the importance of *context* in deciding whether a social group has been identified: "While persecutory conduct cannot define the social group, the actions of the persecutors may serve to identify or even cause the creation of a particular social group." *Id.* Citing the example of a Jew whose business was destroyed by a competitor in Nazi Germany, Lord Hoffman recognized that a persecutor's knowledge that he could act with impunity "for reasons of" (i.e., "on account of") his victim's religion went to the heart of the analysis of why the harm occurred. *Id.*

### D. The Respondent Was Harmed and Has a Well-Founded Fear of Harm on Account of Membership in a Particular Social Group

Once a particular social group has been recognized, the asylum applicant must present at least "some evidence" of motive on the part of the persecutor, either direct or circumstantial, from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or imputed protected ground. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992);

*Ratnam v. INS*, 154 F.3d 990 (9th Cir. 1998); *Singh v. Ilchert*, 63 F.3d 1501 (9th Cir. 1995) (finding that persecutory conduct may have more than one motive); *Matter of S-P-,* 21 I&N Dec. 486 (BIA 1996). In identifying persecutorial motive, a number of factors may be taken into consideration. *Matter of S-P-, supra.*

First, to assess motivation, it is appropriate to consider the factual circumstances surrounding the violence. The factual record reflects quite clearly that the severe beatings were directed at the respondent by her husband to dominate and subdue her, precisely because of her gender, as he inflicted his harm directly on her vagina, sought to abort her pregnancy, and raped her.

Second, the very incomprehensibleness of the husband's motives supports the respondent's claim that the harm is "on account of" a protected ground. This is not a case of simple assault. Nor is this a case where the factors motivating the harm arguably are limited only to some comprehensible criminal motive. *Cf. Matter of V-T-S-, supra* (holding that evidence that perpetrators were motivated by their victim's wealth, in the absence of evidence to suggest other motivations, will not support a finding of persecution within the meaning of the Act). Rather, this is a case where the respondent's husband treated her merely as his property, to do with as he pleased. Under these circumstances, to place undue emphasis on the respondent's explanations for her husband's motives misses the obvious point that *no good reason* could exist for such behavior. *See, e.g., Sangha v. INS, 103 F.3d 1482,* 1490 (9th Cir. 1997); *Nasseri v. Moschorak*, 34 F.3d 723, 730 (9th Cir. 1994) (finding that even if the persecutors were ignorant of their victim's specific views and activities, "[i]t is difficult to imagine any other reason why the mujahidin would have abducted her, beat her, threatened her with a gun, and questioned her about her political contacts"), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (1996).

Illegitimate motives can give rise to an inference that the harm has occurred on account of a statutorily protected characteristic which, in this case, is the respondent's membership in a particular social group and her actual or imputed political opinion. *See Rodriguez-Roman v. INS*, 98 F.3d 416, 419 (9th Cir. 1996). In fact, in the political opinion context, police investigations which are "part of a pattern of political suppression" give rise to an inference that harm has occurred on account of a protected characteristic, despite the claimed legitimate prosecutorial function of these government agents. *Ratnam v. INS, supra; Singh v. Ilchert, supra*, at 1508; *see also Maldonado-Cruz v. INS*, 883 F.2d 788 (9th Cir. 1989), *rev'g Matter of Maldonado-Cruz*, 19 I&N Dec. 509 (BIA 1988); *Blanco-Lopez v. INS,* 858 F.2d 531 (9th Cir. 1988). Thus, the illegitimacy of a persecutor's motives has the opposite effect of that suggested by the majority. The record reflects, as it did in *Matter of Kasinga, supra*, that "no legitimate reason" exists for the severe harm inflicted upon the respondent. *See id.* at 15.

Third, we should attempt to identify why such horrific violence occurs at all. In *Kasinga*, we determined that FGM exists as a means of controlling women's sexuality. So too does domestic violence exist as a means by which men may systematically destroy the power of women, a form of violence rooted in the economic, social, and cultural subordination of women. *See* Rhonda Copelon, *Recognizing the Egregious in the Everyday: Domestic Violence as Torture,* 25 Colum. Hum. Rts. L. Rev. 291, 303-06 (1994). The fundamental purpose of domestic violence is to punish, humiliate, and exercise power over the victim on account of her gender:

> At its most complex, domestic violence exists as a powerful tool of oppression. Violence against women in general, and domestic violence in particular, serve as essential components in societies which oppress women, since violence against women not only derives from but also sustains the dominant gender stereotypes and is used to control women in the one space traditionally dominated by women, the home.

*Report of the Committee on the Elimination of Discrimination Against Women,* U.N. Comm. on the Elimination of Discrimination Against Women, 47th Sess., Supp. No. 38, para. 26, at 8, U.N. Doc. A/47/38 (1992). Moreover, it is well established in the record before us that Guatemalan society is especially oppressive of women generally. The materials submitted reveal that extreme patriarchal notions are firmly entrenched in Guatemalan society.

Finally, as has been advanced by the House of Lords in *Islam (A.P.) v. Secretary of State for the Home Dep't, supra*, the level of impunity with which a persecutor acts is relevant to an "on account of" determination. Like the persecutor who targets the Jewish shopkeeper because he knows he can act with impunity owing to his victim's religion, the respondent's husband knows he can commit his atrocities with impunity because of the respondent's gender and their relationship. The respondent testified that her husband repeatedly expressed that it would be "useless" for her to contact the authorities, especially given his connections with members of the police. The respondent's husband was not a simple criminal, acting outside societal norms; rather, he knew that, as a woman subject to his subordination, the respondent would receive no protection from the authorities if she resisted his abuse and persecution.

It is reasonable to believe, on the basis of the record before us, that the husband was motivated, at least in part, "on account of" the respondent's membership in a particular social group that is defined by her gender, her relationship to him, and her opposition to domestic violence. *See INS v. Elias-Zacarias, supra; Ratnam v. INS, supra; Singh v. Ilchert, supra; Matter of S-P-, supra; Matter of Kasinga, supra.*

## IV. PERSECUTION ON ACCOUNT OF ACTUAL OR IMPUTED OPINION OPPOSING DOMESTIC

ABUSE AND VIOLENCE AGAINST WOMEN

Although they represent distinct bases for asylum and withholding of deportation, claims of persecution inflicted on account of membership in a particular social group and of persecution inflicted on account of actual or imputed political opinion may share certain attributes. Maryellen Fullerton, *A Comparative Look at Refugee Status Based on Persecution due to Membership in a Particular Social Group,* 26 Cornell Int'l L.J. 505, 562 (1993). One significant factor that is essential to both constructions is that of the persecutor's motive, or nexus. In addition, the victim's implicit or explicit opposition or resistance to the persecution may be a factor common to both categories. *See Matter of Kasinga, supra.*

Opposition to male domination and violence against women, and support for gender equity, constitutes a political opinion. *See Fatin v. INS, supra*, at 1242 (acknowledging that there is "little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes"). Congress' enactment of the Violence Against Women Act of 1994, 42 U.S.C. § 13981 (1994) ("VAWA"), which addresses crimes of violence "due, at least in part, to an animus based on the victim's gender," reflects a political point of view that finds domestic violence abhorrent and intolerable. 42 U.S.C. § 13981(d)(1); *see also* section 240A(b)(2) of the Act, 8 U.S.C. 1229b(b)(2) (Supp. II 1996) (providing cancellation of removal for aliens in the United States who are battered by a permanent resident or United States citizen spouse). Such opposition is not restricted to those who have not been victims of domestic violence, but constitutes a political opinion that may also be held by victims of domestic violence themselves. Both the respondent's status as a battered spouse in an intimate relationship with a man who imposes such domination and her actual or perceived opinion opposing domestic violence trigger continuing abuse from the persecutor who seeks to dominate her.

### A. Resistance to Domestic Violence As an
### Actual or Imputed Political Opinion

Since the Supreme Court's decision in *INS v. Elias-Zacarias, supra*, asylum eligibility based on political opinion has turned on whether the persecution was inflicted on account of "the political opinions of the victims." *Sangha v. INS, supra*, at 1488. The Ninth Circuit recently held unequivocally that "[u]nder our case law, and unchanged by *Elias-Zacarias, an applicant can establish his political opinion on the basis of his own affirmative political views, his political neutrality, or a political opinion imputed to him by his persecutors*." *Id.* (emphasis added). It is similarly well established that "[n]on-governmental groups need not file articles of incorporation before they can be capable of persecution." *Korablina v. INS*, 158

F.3d 1038, 1044 (9th Cir. 1998). Moreover, "a single isolated incident may not 'rise to the level of persecution, [but] the cumulative effect of several incidents may constitute persecution.'" *Id.* (quoting *Sangha v. INS, supra,* at 1487).

In order to establish her political opinion, an asylum-seeker may testify about her political beliefs, *Rodriguez-Roman v. INS, supra*, at 419, or provide evidence of her past activities, *Gomez-Saballos v. INS*, 79 F.3d 912, 917 (9th Cir. 1996). As the Ninth Circuit reiterated in *Meza-Menay v. INS*, 139 F.3d 759, 763 (9th Cir. 1998), "[A]n asylum petitioner may hold a political opinion within the meaning of the INA even if the petitioner did not participate in organized political activities." *See also Lazo-Majano v. INS*, 813 F.2d 1432, 1435 (9th Cir. 1987) (finding that a belief that "the Armed Force [was] responsible for lawlessness, rape, torture and murder," constituted a political opinion, even though the woman who held that belief did not participate in politics), *overruled on other grounds by Fisher v. INS, supra.* The respondent's political opinion opposing male domination and domestic violence imposed upon her by her husband is clearly stated in the record—both in her statements and her actions. As he persisted in subjecting her to persecution that would affirm his dominance over her, she resisted him, tried to flee, sought governmental intervention, and filed legal actions against him.

The respondent may, in addition, establish a "political opinion" by demonstrating that such an opinion has been attributed to her by her persecutors. *See INS v. Elias-Zacarias, supra*, at 482; *Canas-Segovia v. INS,* 970 F.2d 599, 601-02 (9th Cir. 1992); *see also Matter of S-P-, supra.* Opposition to male domination and violence against women may be imputed to a victim of domestic violence who protests, resists, or seeks to escape such domination and violence. *See, e.g., Lazo-Majano v. INS, supra.* Such a perception, whether actual or simply imputed, is a motivator for further violence and abuse. *See Shirazi-Parsa v. INS*, 14 F.3d 1424, 1430 (9th Cir. 1994) (stating that it is enough that the regime "'falsely attributes an opinion to the victim, and then persecutes the victim because of that mistaken belief about the victim's views'" (quoting *Canas-Segovia v. INS, supra,* at 602)); *Lazo-Majano v. INS, supra,* at 1446. In response to a victim's actual or perceived opposition, the abuser who inflicts such violence may inflict more violence in an effort to reassert what he considers his rightful power and control over the victim. *Lazo-Majano v. INS, supra; see also Campos-Sanchez v. INS,* 164 F.3d 448, 449 (9th Cir. 1999).

In establishing an imputed political opinion, the focus of inquiry turns away from the views of the victim to the views of the persecutor. *Sangha v. INS, supra,* at 1489. As the Ninth Circuit makes clear, "If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the Act." *Id.; see also Nasseri v. Moschorak, supra*, at 730 (holding

that "regardless of how her attackers came to view her as a threat [to the fundamentalist cause], it is clear that they took action against her on account of opinions they imputed to her . . . [and] are likely to harm her in the future because of political opinions they believe she possesses").

Such imputation may be reflected when one party to a conflict insists that his victim is aligned with the other side. *See, e.g., Singh v. Ilchert*, *supra*, at 1509; *Maldonado-Cruz v. INS, supra*, at 792. Or, the victim may have publicly expressed political views which could easily have been known to his persecutors. *See Nasseri v. Moschorak, supra*, at 729-30. Finally, the Ninth Circuit has acknowledged that there exists an adequate nexus between the harm imposed and a protected ground when there is no other logical reason for the persecution. Each of these considerations is consistent with the circumstances that exist here.

### B. Evaluation of the Harm Suffered by the Respondent on Account of Political Opinion

The notion that the "heinous abuse" suffered by the respondent, who opposed her husband's abuse, challenged his dominance, attempted to leave him, and sought relief from the government, was only personal and does not constitute anything more than illegitimate criminal conduct unprotected under the Act is unacceptable. *See Nasseri v. Moschorak, supra*, at 729-30; *Matter of S-P-, supra*. This type of differentiation between the supposedly more private forms of persecution, typically suffered by women, and the more public forms of persecution, typically suffered by men, is exactly the type of outdated and improper distinction that the DOJ Guidelines were intended to overcome. *See* Kristin E. Kandt, *United States Asylum Law: Recognizing Persecution Based on Gender Using Canada as a Comparison*, 9 Geo. Immigr. L.J. 137, 145 (1995); *see also* Nancy Kelly, *Gender-Related Persecution: Assessing the Asylum Claims of Women,* 26 Cornell Int'l L.J. 625 (1993); Pamela Goldberg, *Anyplace But Home: Asylum in the United States for Women Fleeing Intimate Violence*, 26 Cornell Int'l L.J. 565, 591-92 (1993).

As the respondent has been found credible by the Immigration Judge and the majority has conceded that her account is credible, her account is to be taken as true. *Lazo-Majano v. INS, supra*, at 1434. The record reflects that the respondent not only holds an actual opinion opposing her husband's violence, but it is apparent that her husband believed that her resistance to his domination and abuse, particularly as reflected in her seeking assistance from governmental authorities, constituted an opinion opposing his male dominance. Imputing this opinion to her, he sought to overcome her opposition by escalating his abuse of her. The legal interpretation of such a course of events—which undisputedly has occurred in the respondent's case—is classic. It corresponds to our longstanding analysis of the elements

that must be present to support a finding of persecution on account of a protected ground. *See, e.g., Matter of Mogharrabi, supra*, at 446 (requiring that an applicant for asylum establish that: "(1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware [or could . . . become aware] that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien" (quoting *Matter of Acosta, supra*, at 226)); *see also Matter of Kasinga, supra.*

Both we and the federal courts recognize the merit to asylum claims involving rape and other forms of physical and mental violence against women on account of their actual or imputed political opinion. *See Lopez-Galarza v. INS,* 99 F.3d 954, 960 (9th Cir. 1996); *Lazo-Majano v. INS, supra; Matter of D-V-*, 21 I&N Dec. 77 (BIA 1993); *see also Angoucheva v. INS,* 106 F.3d 781, 793 n.2 (7th Cir. 1997) (Rovner, J., concurring) (stating that "[r]ape and sexual assault are generally understood today not as sexual acts borne of attraction, but as acts of violent aggression that stem from the perpetrator's power over and desire to harm his victim"); *United States v. Powers*, 59 F.3d 1460, 1465-66 (4th Cir. 1995), *cert. denied*, 516 U.S. 1077 (1996); *United States v. Hammond*, 17 M.J. 218, 220 n.3 (C.M.A. 1984) (stating that one of the "common misconceptions about rape is that it is a sexual act rather than a crime of violence").

The evidence in the record before us establishes, with chilling certainty, that the respondent's husband was aware of, and imputed to the respondent, her beliefs in opposition to domestic violence. The record amply supports the conclusion that the abuse suffered by the respondent was on account of the abuser's belief that, as her husband, he could dominate the respondent physically and emotionally, as well as socially and culturally. For example, according to the respondent's credible account, her husband explained his repeatedly striking her, whipping her with an electrical cord, threatening her with a machete, pistol whipping her, raping her, sodomizing her, breaking a mirror over her head, kicking her in the spine, attempting to abort their second child, slamming her head into furniture and dragging her by the hair, and knocking her unconscious, as his right as her husband.

In the case before us, the victim's opposition to such treatment was known or could have been known to the abuser. *See Matter of Mogharrabi, supra.* This is illustrated in the respondent's credible reports of her husband's responses to her protestations and attempts to leave him. In addition, the record demonstrates that the abuser had the inclination and the capability to overcome or seek to overcome such opposition. *See id.* This is shown by the respondent's credible reports of the abuser's bragging to the respondent that, while serving in the Guatemalan Army, he killed babies and the elderly, as well as by her account of the physical and emotional harm he already has inflicted on her. Such conclusion is supported further by credi-

943

ble reports that the Guatemalan Government will not intercede to protect the respondent, as well as by corroborating evidence that establishes that domestic violence in Guatemala is pervasive.

Moreover, the record before us reflects that the abuser is motivated to continue and even escalate his abuse in order to stifle and overcome his victim's opposition to it. As the majority notes, the rage, abuse, and violence against the respondent escalated as the marriage progressed. This is illustrated by the respondent's credible and corroborated account in the record of the persistent, brutal physical and mental abuse inflicted by her husband. *See* Deborah Anker et al., *Women Whose Governments are Unable or Unwilling to Provide Reasonable Protection from Domestic Violence May Qualify as Refugees Under United States Asylum Law*, 11 Geo. Immigr. L.J. 709, 713 (1997) (referring to research documenting increases in the frequency and severity of violence relative to the time spent in an abusive relationship).

In *Lazo-Majano*, a sergeant in the Salvadoran military raped the respondent on several occasions and inflicted other physical abuse, including beatings. The sergeant denounced the respondent and her husband as "subversives" and threatened to kill them both if her husband, who had fled the country for political reasons, returned to El Salvador. *Lazo-Majano v. INS, supra,* at 1433. The court concluded:

> Persecution is stamped on every page of this record. [The respondent] has been singled out to be bullied, beaten, injured, raped, and enslaved. [Her] initial acquiescence [in working for the official] does not alter the persecutory character of her treatment. . . . The persecution has been conducted by a member of the Armed Force, a military power that exercises domination over much of El Salvador . . . . [The sergeant] had his gun, his grenades, his bombs, his authority and his hold over [the respondent] because he was a member of this powerful military group.

*Id.* at 1434; *see also Lopez-Galarza v. INS, supra*.

The factors considered by the Ninth Circuit in *Lazo-Majano* closely resemble those in the case before us. In that case, the victim first acquiesced to the abuse. Here, the record reflects that, from the outset, the respondent's husband was abusive and that she submitted to him. In *Lazo-Majano*, the persecutor invoked the full force of the Salvadoran Army to intimidate the victim and overcome her resistance. Here, the respondent's husband invoked his affiliation with the military as a means to intimidate and continue to abuse the respondent.

The majority insists that the respondent's husband persecuted her regardless of what she believed or what he thought she believed, claiming that the record does not reflect he was motivated by gender animus generally. The majority contends that the abuser was not, even in part, motivated by the respondent's resistance to his domination, even though he had told her he viewed women as property to be treated brutally in order to sustain

944

his domination. This is contrary to fact, law, and logic. To reach such a conclusion, the majority must ignore entirely the mixed motive doctrine, which not only constitutes a well-established basis for asylum in cases arising before the Ninth Circuit, but also constitutes a basis for asylum in claims made before this Board. *See Ratnam v. INS, supra; Singh v. Ilchert, supra*, at 1508; *Matter of S-P-, supra*. Furthermore, as we stated in conjunction with our consideration of the respondent as a member of a particular social group, illegitimate motives triggering persecution raise an inference that the harm has occurred on account of a statutorily enumerated ground. *Rodriguez-Roman v. INS, supra; Matter of Kasinga, supra.*

The Ninth Circuit has repeatedly criticized this Board's tendency to confuse political with "personal" interests when evaluating claims of persecution based on political opinion. *Desir v. Ilchert*, 840 F.2d 723, 728 (9th Cir. 1988) (recognizing that the "essentially political nature of the respondent's predicament" was evident from the fact it was a "relationship of the weak to the powerful"); *Lazo-Majano v. INS, supra; Korablina v. INS, supra,* at 1045; *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969). Moreover, the respondent has faced an exponentially increasing imposition of severe abuse, which has escalated in tandem with her efforts to resist, oppose, or seek protection from such harm. As the Immigration Judge noted, the beatings worsened "when the respondent protested or tried to leave her husband to get help," and "violent behavior increased in response to respondent's resistance to domination." Strikingly similar evidence of the persecutor's motive to quash the victim's political opinion resulted in the Ninth Circuit's opinion in *Gonzales-Neyra v. INS*, 122 F.3d 1293, 1295 (9th Cir. 1997), in which the court found that the escalation of harm supported an inference imputing the victim's political opinion in opposition to the persecutor's goals as motivation for the increasingly volatile threats.

To summarize, the situation faced by the respondent is strikingly close to our decision in *Matter of Kasinga, supra*, relating to persecution motivated by membership in a social group, in which a woman who opposed male domination and the infliction of violence and abuse due to her gender was afforded protection under United States asylum laws. Whether the political opinion is actually held or imputed makes little difference where the alien's life is equally at risk. *Desir v. Ilchert, supra*, at 729; *Lazo-Majano v. INS, supra*, at 1435. The Ninth Circuit stated:

> In deciding whether anyone has a well-founded fear of persecution or is in danger of losing life or liberty because of a political opinion, one must continue to look at the person from the perspective of the persecutor. If the persecutor thinks the person guilty of political opinion, then the person is at risk.

*Lazo-Majano v. INS, supra*, at 1435. Likewise, the respondent's husband struck out both at the respondent's actual opposition to domestic violence and at what he saw as her resistance to his domination.

Had the respondent been subjected to such heinous abuse due to polit-

945

ical opposition to communism, imputed as a result of her family's economic class or political activities, the majority would recognize her situation as one of persecution on account of political opinion. *See Matter of B-,* 21 I&N Dec. 66 (BIA 1995); *Matter of Chen*, 20 I&N Dec. 16 (1989). She is not less eligible or entitled to protection on account of her political opinion opposing male domination expressed through the abuse of women by their husbands, or the political opinion attributed to her, than were the comparably qualifying applicants to whom we have granted asylum.

## V. CONCLUSION

For the foregoing reasons, I would dismiss the Service's appeal. The Immigration Judge was correct in determining that the respondent is eligible for asylum pursuant to section 208 of the Act, 8 U.S.C. § 1158 (1994). I, therefore, respectfully dissent.