# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-1275 & 04-2417

EHAB S. DAWOUD and AMANI Y. REFAAT,

*Petitioners,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

_____

On Petitions for Review of a Decision of the
Board of Immigration Appeals.
Nos. A95 389 985 & A95 389 986

_____

ARGUED JUNE 1, 2005—DECIDED SEPTEMBER 19, 2005

_____


Before MANION, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Ehab Dawoud was detained and beaten first by Islamic radicals and then by the state security services after a video of his Christian wedding aired on an Egyptian television station. Dawoud and his wife, Amani Refaat, fled Egypt for the United States and applied for asylum after overstaying their visitors' visas, claiming that they had been persecuted because of their religion. The Immigration Judge (IJ) denied the application, and the Board of Immigration Appeals (BIA) affirmed in a separate opinion. Dawoud and Refaat filed a petition for review in this court, but they then moved the Board to

reconsider its decision and twice attempted to have the proceedings reopened. Those motions were denied. They now petition for review of these denials. We grant the petition and remand to the Board for further proceedings.

## I

Dawoud and Refaat are members of the Coptic Church, an orthodox sect of Christianity native to Egypt to which approximately 10% of the population adhere. Several months after they were married, a friend with their permission sent a videotape of their wedding ceremony and reception to a television program that showcases local weddings. The record does not provide much detail about the video, except that it depicted a Coptic ceremony, alcohol consumption, and dancing by a woman who was not fully veiled. A week after the video aired in July 2001, three angry members of the terrorist group al-Gama'a al-Islamiyya came to Dawoud's home to confiscate the tape. They did not identify themselves, but Dawoud recognized them as Islamic fundamentalists from their traditional dress, long beards, accusations that he was an "infidel," and threats of "blood shedding." The terrorists blindfolded Dawoud and took him to a building outside the city, where he was kept chained and underfed for ten days; his captors beat him for consorting with "infidels" and threatened that his "blood would be sacrificed," which they asserted was "legal" in Egypt.

Dawoud was released and returned to his home, where, he said, "I was tired from the beating and psychologically I was sort of destroyed" for fear that the terrorists might return. He chose not to bring the incident to the attention of the authorities, because in Egypt, he claimed, reporting Islamic militants to the government usually brings retribution. Dawoud did call a doctor friend who treated the bruises on his arms and hands; this treatment is allegedly

confirmed by a handwritten note in the record, but other than the hospital letterhead, which is in English, the note is in untranslated Arabic.

Two days after he returned home, Dawoud was confronted by the "National Police of Egypt," who went to his house and said that a report had been filed against him for "insult[ing] the Muslim religion." He was taken to a police building and placed in solitary confinement, where for three days he was tortured by electrocution until he agreed to sign a confession. Dawoud testified that the officers "would have water running underneath me" and then would drop something—presumably an electrical device—into the water, shocking him. Eventually, Dawoud said, "I couldn't handle it anymore, so I decided to sign that confession so they would ease off the pain." He was then released and told to stay in his hometown of Benimazar until he was summoned for a hearing before the Emergency Court, a tribunal frequently criticized by human rights groups, which operates under Egypt's Emergency Law and hears cases that implicate national security. Rather than wait around, Dawoud and his wife secured passports and visas for the United States and fled the country.

The IJ denied Dawoud's and Refaat's asylum applications. (Because Dawoud is the lead petitioner, we refer in the remainder of this opinion to him alone.) The IJ's opinion is riddled with inappropriate and extraneous comments, such as references to the IJ's personal experiences with alcohol in Egypt, commentary on the state of the tourism industry there, and speculation about the attractiveness of the United States to asylum-seekers in general. The IJ found Dawoud not credible because of the "swiftness" with which he obtained his passport and travel visa. The IJ also pointed out that Dawoud failed to corroborate his narrative with affidavits from relatives.

In a lengthy opinion, the BIA noted its disapproval of the IJ's "inappropriate remarks" and rejected the adverse

credibility finding, stating that Dawoud's "testimony was credible in that it was internally consistent, consistent with the written declarations, and not inherently improbable." The Board agreed with the IJ, however, that Dawoud's failure to provide corroborating evidence weighed against him, noting that he did not submit a translated copy of the handwritten medical note, "written or oral" evidence of a summons to the Emergency Court, or affidavits from family members to verify either the showing of the video or Dawoud's subsequent misfortunes. The Board also stated that Dawoud's narrative was at odds with the 2001 State Department Country Report on Egypt, observing that "[t]here is no references [sic] in the background information to the *national* police pursuing the average Coptic Christian . . . especially in collusion with an Islamic fundamentalist organization." The Board also stated that, according to the report, the government's treatment of Copts was improving.

Dawoud and his wife filed a joint motion for reconsideration and reopening. He contended that the decision should be reconsidered because the BIA had erred in concluding that the State Department Report "tended to undermine his story." He also claimed that because of the United States's close relationship to Egypt, the State Department under-reported the government's mistreatment of Copts. He further argued that the case should be reopened because of "new" evidence that conditions for Christians in Egypt had deteriorated as a result of the American invasion of Iraq. The Board denied these motions in an order in which it concluded that Dawoud did not establish any errors in its reading of the State Department Report, and that the war in Iraq did not create a *prima facie* claim of future persecution. The Board also denied a subsequent motion to reopen in which Dawoud sought to argue for the first time that he had been prejudiced by ineffective assistance of counsel.

## II

Before proceeding to the merits, we must first determine which of the BIA's orders is before us in this petition. At oral argument, the lawyer for the petitioners contended that Dawoud had preserved his ability to challenge the BIA's merits denial of the asylum application by filing a petition for review of that order. But as the government observes, Dawoud's brief on appeal is expressly limited to challenging the denial of Dawoud's motion for reconsideration and two motions to reopen. Dawoud has therefore waived any arguments regarding the merits decision. See *United States v. Harris*, 394 F.3d 543, 559 (7th Cir. 2005). We accordingly limit our consideration of the petition to the motions to reconsider and reopen.

## A

Dawoud first challenges the denial of his motion for reconsideration, arguing that the BIA misread the State Department Report and other materials in the record when it found that his account of persecution was inconsistent with country conditions in Egypt. To succeed, a motion to reconsider "shall state the reasons for the motion by specifying the errors of fact or law in the prior Board decision and shall be supported by pertinent authority." 8 C.F.R. § 1003.2(b)(1). We review the denial of a motion to reconsider for an abuse of discretion. *Id.* § 1003.2(a); see *Ali v. Ashcroft*, 395 F.3d 722, 731 (7th Cir. 2005).

Although this is a deferential standard, it is not a meaningless one. We find that this is the rare case in which it is met. First, the BIA's finding that Dawoud's narrative is inconsistent with background information on Egypt is flatly contradicted by the 2001 Country Report and reports in the record from Freedom House, a 60-year-old, U.S.-based human rights group. These materials describe numerous instances in the past few years in which the Egyptian

security services have assaulted, imprisoned, and otherwise discriminated against Copts. For instance, police officers rounded up and tortured some 1,000 Copts as part of a murder investigation in 1998, and 21 Christians were killed in an anti-Copt pogrom in 2000 while the authorities looked on. In the latter case, 92 of 96 defendants were initially acquitted of charges, and ultimately no one was punished seriously except for a Copt, who was imprisoned for violating Article 98 of the penal code, which prohibits "insulting a heavenly religion." This is the same provision that Dawoud was charged with violating. The Country Report details many other instances of government agents using Article 98 to imprison members of religious groups, including Christians, "whose practices deviate from mainstream Islamic beliefs," and notes that the authorities withhold building permits to Christians, fail to investigate murders and assaults of Copts, and harass Christian families attempting to protect their daughters from forcible conversion to Islam.

In concluding that Dawoud's tale is inconsistent with this background information, the BIA focused on a few flowery bromides in the Country Report about Egypt's increased concern over religious freedom. But by ignoring the report's lengthy discussion of repeated and flagrant governmental abuses of Coptic Christians, the Board gives the impression that it did not bother to read the Country Report in its entirety. The report and other background information on the whole is quite consistent with—and provides a plausible backdrop for—Dawoud's claim of persecution. The Board abused its discretion by concluding otherwise. (We disregard for this purpose an affidavit from expert witness Paul Marshall that Dawoud attempted to introduce with his motion to reconsider and reopen. The BIA reasonably concluded that the affidavit was not admissible "new" evidence, because it dealt exclusively with events that transpired before the BIA's January 2004 merits decision

and thus could have been introduced at the earlier hearing. See 8 C.F.R. § 1003.2(c)(1); *Simtion v. Ashcroft*, 393 F.3d 733, 737 (7th Cir. 2004).)

The Board also erred by faulting Dawoud for claiming that the security services "colluded" with terrorists in persecuting him. This characterization of Dawoud's application fails accurately to reflect his testimony. The record shows that the police pursued Dawoud independently of the terrorists after receiving a tip—quite possibly an anonymous one—about a possible Article 98 violation. Dawoud never alleged that the two groups acted in concert.

**B**

The government argues that even if the BIA erred on the background country information, Dawoud's motion for reconsideration was still properly denied because there were "additional, independently sufficient, bases" for denying the application for asylum—namely, Dawoud's failure to corroborate his claims. In other words, it argues that any error regarding the background country conditions was harmless. Dawoud has little to say in response, but we reject this argument too.

This court has often held that a credible asylum applicant (which, recall, the BIA found that Dawoud was) need not provide corroborating evidence in order to meet his burden of proof. In the past, the BIA has taken a more demanding position. Under its so-called "corroboration rule," even a credible applicant must supply reasonably available corroborating evidence if the IJ demands it. This position stems from the Board's interpretation of 8 C.F.R. § 208.13(a), which provides: "The testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration" (emphasis added). In *In re S-M-J-*, 21 I. & N. Dec. 722, 725 (BIA 1997), the BIA read this regulation to allow IJs to demand corroboration even

from a credible applicant: "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." See also *In re M-D-*, 21 I. & N. Dec. 1180, 1183-84 (BIA 1998). The agency's interpretation of its regulation is entitled to substantial deference. See *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991); *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1146-47 (7th Cir. 2001).

Nevertheless, this court has often expressed concern about the way that the BIA applies 8 C.F.R. § 208.13(a), which on its face allows for the possibility of a credible applicant's establishing a right to asylum without any corroboration. See *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004). We have repeatedly rejected IJs' decisions that a credible asylum applicant's claim can be rejected solely because she did not supply corroborating evidence. See *Zheng v. Gonzales*, 409 F.3d 804, 810 (7th Cir. 2005); *Lin v. Ashcroft*, 385 F.3d 748, 756 (7th Cir. 2004); *Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004); *Ememe v. Ashcroft*, 358 F.3d 446, 453 (7th Cir. 2004); *Uwase v. Ashcroft*, 349 F.3d 1039, 1045 (7th Cir. 2003). The regulation, in our view, cannot bear an interpretation that would exclude all possibility of an applicant's relying exclusively on credible but uncorroborated testimony, so long as that testimony is specific, detailed, and convincing. See *Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003); *Carvajal-Munoz v. INS*, 743 F.2d 562, 574 (7th Cir. 1984).

The policy behind a rule permitting reliance solely on credible testimony is simple. Many asylum applicants flee their home countries under circumstances of great urgency. Some are literally running for their lives and have to abandon their families, friends, jobs, and material possessions without a word of explanation. They often have nothing but the shirts on their backs when they arrive in this country. To expect these individuals to stop and

collect dossiers of paperwork before fleeing is both unrealistic and strikingly insensitive to the harrowing conditions they face. See *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004). As we stated there:

> No matter what form of corroboration is at issue, the corroboration requirement should be employed reasonably. It is always possible to second-guess the petitioner as to what evidence would be most cogent, and, consequently, there is a distinct danger that, in practice, the corroboration requirement can slip into "could have-should have" speculation about what evidence the applicant could have brought in a text-book environment. The IJs need to take to heart the BIA's blunt admonition that corroboration should be required only as to "material facts" and only when the corroborative evidence is reasonably accessible.

*Id.* at 502-03.

The Ninth Circuit has taken a more categorical approach against the BIA's corroboration rule. In *Ladha v. INS*, 215 F.3d 889, 899 (9th Cir. 2000), it said that it "does not require corroborative evidence . . . from applicants for asylum and withholding of deportation who have testified credibly" (citation and internal quotation marks omitted). The Second, Third, Sixth, and Eighth Circuits have adopted a position that accepts a requirement of corroboration even when the applicant is credible on her own, essentially finding the BIA's interpretation of the regulation to be reasonable and deserving of deference. See *Dorosh v. Ashcroft*, 398 F.3d 379, 382-83 (6th Cir. 2004); *El-Sheikh v. Ashcroft*, 388 F.3d 643, 647 (8th Cir. 2004); *Abdulai v. Ashcroft*, 239 F.3d 542, 551 (3d Cir. 2001); *Diallo v. INS*, 232 F.3d 279, 285-86 (2d Cir. 2000). But even these courts recognize that "supporting documentation must be provided only if it is of the type that would normally be created or available in the particular country and is accessible to the

alien, such as through friends, relatives, or co-workers." *Dorosh,* 398 F.3d at 382-83 (internal quotation marks omitted).

Looking toward the future, the difference in approaches among the circuits with respect to the Board's corroboration rule will become a moot point. On May 11, 2005, the President signed into law the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, which provides that an IJ may require an otherwise credible applicant to provide corroborating evidence unless the applicant does not have the evidence and cannot reasonably obtain it. *Id.* § 101(a)(3) (amending 8 U.S.C. § 1158(b)(1)). This rule affects only new asylum applicants (whose applications are filed after May 11, 2005), however, and so does not apply to Dawoud's case. *Id.* § 101(h)(2). Interestingly, even under the new rules there will still be some applicants whose cases will turn solely on their own testimony—those who neither have nor can reasonably obtain corroborating evidence.

When the time comes and we have a fully briefed case before us, we can decide how much difference, as a practical matter, the REAL ID Act has made. It is possible that the change is less than meets the eye, since even now there is no dispute about the appropriateness of asking for corroboration in the common situation when the IJ has some doubt about an applicant's credibility. Here, as the BIA acknowledged, Dawoud provided credible, detailed, and convincing testimony. Furthermore, this was not a case where corroborating information was wholly lacking; as we have noted above, the State Department Report taken as a whole did corroborate Dawoud's account. We find that the BIA in these circumstances should not have rested its decision on his failure to supply even more evidence. Dawoud and his wife are entitled to have their applications for asylum assessed on the basis of the record they presented.

## C

Dawoud makes one other argument on appeal. He contends that his second motion to reopen based on ineffective assistance of counsel was improperly denied. But Dawoud does not challenge the BIA's basis for denying the motion—that he failed to raise the ineffectiveness argument in his appeal to the BIA and thus did not exhaust his administrative remedies, see *Mojsilovic v. INS*, 156 F.3d 743, 748 (7th Cir. 1998). Instead, he simply rehashes the merits of the issue. We see no basis for upsetting the BIA's judgment on this claim.

## III

For the foregoing reasons, we GRANT the petition for review and REMAND the case for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*