**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 18, 2007
Decided April 23, 2007

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. JOEL M. FLAUM, *Circuit Judge*

No. 06-3143

| | |
|---|---|
| SONIA MARIBEL JUAREZ-LOPEZ, et al., *Petitioners,* | Petition for Review of an Order of the Board of Immigration Appeals |
| *v.* | Nos. A70-060-766 |
| | A78-366-452 |
| ALBERTO R. GONZALES, Attorney General of the United States, *Respondent.* | A78-366-301 |

**O R D E R**

Sonia Maribel Juarez-Lopez[1], a citizen of Guatemala, petitions for review of an order of the Board of Immigration Appeals denying her application for asylum. Following a removal hearing, an Immigration Judge denied her application for

---

[1] The petitioner's name is apparently Sonia Lopez-Juarez, but the name Juarez-Lopez is used by the parties here and throughout the record. According to the petitioner, the people helping her fill out her asylum application reversed her mother's and father's names. To avoid confusion, we have adopted the parties' convention and used "Juarez-Lopez" throughout our discussion.

asylum on the ground that she was not a credible witness and also denied her the other immigration relief she sought. The BIA summarily affirmed. Juarez-Lopez now petitions for review of her asylum claim only. Because the IJ's adverse credibility finding is not supported by substantial evidence, and since we cannot decide in the first instance whether Juarez-Lopez would be entitled to asylum if found to be credible, we grant her petition and remand the matter back to the BIA.

Juarez-Lopez and her sons, Sergio Lopez and Rigoberto Lopez, arrived in the United States from Guatemala in February 1990. At the time, the boys were 7 and 2 years old, respectively. In November 1990 Juarez-Lopez completed an application for asylum; that document provides few details about her background or the nature of her claim, save her statement that she fears for her life. In early 1991 she was interviewed by an asylum officer, but the administrative record contains no transcript or other description of the discussion during the interview. The record is also silent about who, if anyone, helped Juarez-Lopez prepare her application. Juarez-Lopez had another son in 1992 and a daughter in 1994; both were born in the United States. As far as the administrative record shows, Juarez-Lopez heard nothing regarding her asylum claim until 2002 when the Department of Homeland Security granted her another asylum interview—the details of which are also absent from the administrative record—then initiated removal proceedings against her and her two non-citizen sons. The three conceded removability but continued to press for asylum. In July 2004 Juarez-Lopez and Sergio testified at a hearing before an IJ.

Juarez-Lopez testified that she was born in 1966 in Guatemala. When she was about 12 or 13, she was allegedly raped by a man 15 to 17 years her senior, Rigoberto de la Pena, who lived nearby. Juarez-Lopez testified that she did not report the rape to the police or to her parents because de la Pena threatened to kill her parents if she did. Over the next three years, de la Pena raped Juarez-Lopez at least seven more times. Because of this contact, Juarez-Lopez became pregnant with her oldest son, Sergio, when she was 16. Her parents did not want her to report the rape to the police because de la Pena was wealthy and they were afraid of him. Juarez-Lopez left the town and lived with her sister and then with her mother's cousin. When Sergio was about five, Juarez-Lopez went back to visit her parents, and de la Pena raped her again. She testified that she became pregnant a second time, and that de la Pena took her to live with him. At de la Pena's insistence, she named her second son Rigoberto, after him, even though de la Pena would not acknowledge the boy as his own by giving him his last name. Juarez-Lopez testified that de la Pena was physically violent and threatened to harm her parents if she told anyone about the abuse. De la Pena was involved with another woman at this time, Rebeca Ramos, who was also abusive and violent toward Juarez-Lopez. Juarez-Lopez worked for Ramos cleaning her house. After about six months, Juarez-Lopez moved out of de la Pena's house and returned to her parents'

home. Juarez-Lopez was still afraid of de la Pena, who beat her before she left and threatened to kill her if she was ever with another man. She went to live with her sister in another town, but she explained that she became frightened when guerillas stopped the bus she was traveling on during a return visit to her parents. Juarez-Lopez testified that she finally decided to leave Guatemala in 1990 because she was afraid of continuing violence by de la Pena and Ramos and of guerilla attacks, and she wanted to protect her children.

Throughout Juarez-Lopez's testimony, the IJ's reluctance to believe that she was raped was apparent. After Juarez-Lopez had given her account of being raped for the first time at age 12 or 13, the IJ asked, "Now, how do I know this was not a consensual arrangement?" Juarez-Lopez answered that she was telling the truth and would not lie in front of her children. The IJ responded:

> But, nevertheless, unfortunately on occasion people lie. And even in this country young ladies who had arrangements with other boyfriends later charged them with rape. And in some cases innocent boys are sent to jail because the lady changed her mind. How do I know that this is not the incident in your case?

Later the IJ asked:

> How do I know that you're not making up this story? That you're coming here as an economic refugee and you have no legal right to be here and you're making up a story so you can claim asylum? And there's reasons [*sic*] for you to misstate the facts, because you want to stay here and there's no other way that you can stay here unless you make up a story. Now, how do I know, do I have anything other than your statement that you claim that you were raped by this young man in Guatemala?

In denying the family's applications for asylum, the IJ did not analyze whether the events Juarez-Lopez described could constitute past persecution or give rise to an objectively reasonable fear of future persecution. Instead, the IJ based his decision entirely on his finding that Juarez-Lopez was not credible.

The IJ characterized her testimony as "vague, meager, and inconsistent." He observed that Juarez-Lopez did not mention her two oldest sons in her asylum application in 1990 but instead had stated "none" in response to questions about children. The IJ further explained that Juarez-Lopez said nothing in the application about having been raped.

The IJ next said that he doubted Juarez-Lopez's credibility because of her prolonged interactions with de la Pena. The IJ was skeptical that she would move in with him and name her second son after him if, in fact, he repeatedly raped her. The IJ also characterized as "unbelievable" Juarez-Lopez's testimony that de la Pena would not acknowledge her children as his own but still compelled her to name her second son after him.

The IJ acknowledged that Juarez-Lopez did disclose the alleged rapes, her children, and an assault by Ramos in the declaration she attached to her application for cancellation of removal in 2004, but he labeled that declaration as "inconsistent with her testimony" because in the declaration she does not mention living with de la Pena for six months or that Ramos and de la Pena were lovers. The IJ also thought it "confusing" that Juarez-Lopez testified at her hearing that she lived with a sister during and after her first pregnancy but states in her declaration that she returned to her parents' house to have the baby.

In addition, the IJ questioned Juarez-Lopez's "honesty" concerning her explanation for why the father of her son born in the United States is listed incorrectly on the child's birth certificate. Juarez-Lopez testified that the father is her current partner, Luis Eduardo Rodas, but that the woman who completed the birth certificate wrote "Jorge Rivera" by mistake. The IJ was doubtful that this woman "would not just leave the father's name blank, instead of fabricating a name."

Because of these perceived inconsistencies, the IJ decided that corroboration was "essential" to Juarez-Lopez's case. The IJ then observed that there existed in the record "absolutely no corroborating evidence" to establish that Juarez-Lopez's relationship with de la Pena was not consensual. The IJ noted that she had not submitted affidavits from her mother or other family members and that this "seriously undermines [her] claim." The IJ also faulted Juarez-Lopez for not submitting documentation of any of the injuries she suffered at the hands of de la Pena and Ramos.

In her petition for review, Juarez-Lopez argues that she suffered persecution on account of her membership in a particular social group, young poor women in Guatemala. She asserts that members of this group are particularly vulnerable to rape and other forms of sex-based discrimination, and that governmental authorities are unwilling and unable to protect young women. Juarez-Lopez acknowledges that immigration statutes and regulations do not currently include gender as a possible basis for asylum relief but requests that we remand her case with instructions to adjudicate her claim under the final regulations regarding gender-based persecution, when they are published.

The agency did not reach the question of whether Juarez-Lopez has a valid claim for asylum based on current law, and we cannot make the "basic asylum eligibility decision" in the first instance. *INS v. Ventura*, 537 U.S. 12, 16-17 (2002); *see also Gonzales v. Thomas*, 126 S. Ct. 1613, 1615 (2006); *Kay v. Ashcroft*, 387 F.3d 664, 677 (7th Cir. 2004). Our role is limited to reviewing the adverse credibility finding, which is the sole basis given by the agency for denying Juarez-Lopez's claim. If that finding is not supported by substantial evidence, then we must remand to the agency. *See Mensah Koffi Adekpe v. Gonzales*, No. 05-3951, 2007 U.S. App. LEXIS 5840, at *19 (7th Mar. 14 Cir. 2007). As for whether the agency should hold this case if a remand is ordered, *see In re R- A-*, 22 I. & N. Dec. 906 (1999), *vacated by* Op. Att'y Gen. (2001), that is a matter for the BIA to decide.

With respect to the adverse credibility finding, Juarez-Lopez argues that it is not supported by substantial evidence because the IJ's reasoning is speculative, illogical, or otherwise not cogent. Juarez-Lopez takes issue with the suggestions made by the IJ, both in his written decision and during his questioning, that her relationship with de la Pena was consensual. She further asserts that the perceived "inconsistencies" between her asylum application and her declaration concern issues that are not inconsistent at all or, at most, are peripheral to her asylum claim.

Because the BIA summarily affirmed, we review the decision of the IJ. *Diallo v. Gonzales*, 439 F.3d 764, 765 (7th Cir. 2006). An IJ's adverse credibility finding must be supported by substantial evidence.[2] *See Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006); *Chen v. Gonzales*, 420 F.3d 707, 709 (7th Cir. 2005). We will uphold the IJ's decision unless the evidence compels a contrary conclusion. 8 U.S.C. § 1252(b)(4)(B); *Shtaro*, 435 F.3d at 715. Although an IJ's finding regarding credibility is entitled to highly deferential review, we look for specific, cogent reasons that bear a legitimate nexus to the IJ's finding. *Shtaro*, 435 F.3d at 715; *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006); *Dong v. Gonzales*, 421 F.3d 573, 577 (7th Cir. 2005).

First, the IJ based his credibility finding on information that he expected to be in Juarez-Lopez's asylum application but is not, i.e., mention of her children and the alleged rapes. But what is most remarkable about the application is that it discloses virtually no meaningful information beyond Juarez-Lopez's name and

---

[2] Because Juarez-Lopez petitioned for asylum in 1990, her case is not affected by the revised credibility standards of the REAL ID Act of 2005, see Pub. L. No. 109-13, 119 Stat. 231. The new standards apply only to petitions for asylum made on or after May 11, 2005. *Id*. at § 101(h)(2). *See also Diallo*, 439 F.3d at 766 n.l; *Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005).

address.  For example, in response to the question about why she continued traveling to the United States, Juarez-Lopez answered only "no."  Because of the paucity of information in her application relative to her hearing testimony, the differences seized upon by the IJ hardly amount to inconsistencies.  An asylum application need not be complete and may be supplemented with testimony. *Kllokoqi v. Gonzales*, 439 F.3d 336, 342 (7th Cir. 2005); *see also Chen*, 420 F.3d at 710.

The IJ also failed to consider the possibility that Juarez-Lopez gave a fuller account in her interview with the asylum officer just two months after completing her application.  A summary of this interview and the asylum officer's interview notes should have been made part of the administrative record but were not.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.9(f); *see also Terezov v. Gonzales*, No. 06-2101, 2007 U.S. App. LEXIS 5940, at *19 (7th Cir. Mar. 15, 2007) (vacating where incomplete administrative record undermined agency's adverse determination). The IJ, though, appears not to have addressed the omission even after Juarez-Lopez alluded to the interview during cross-examination.  Government counsel asked Juarez-Lopez why she omitted information about the alleged rapes from her asylum application, and she responded that "they did not ask me on detail, they just asked me the quick questions."  This answer seems to refer to the asylum interview, not the asylum application.  Similarly, when asked why the application does not include any mention of her children, Juarez-Lopez answered: "They only asked me if I had children, I said yes and I have two.  They did not ask me what did they want me to do with the children or what do I have to do for them."  Rather than fault Juarez-Lopez for omissions in her asylum application, the IJ should have investigated whether the missing summary of the asylum interview would have allayed his apparent concern about recent fabrication.

Moreover, the IJ should not have based an adverse credibility finding on Juarez-Lopez's understandable reluctance to divulge information about her rapes. *See Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) (A "victim of sexual assault does not irredeemably compromise his or her credibility by failing to report the assault at the first opportunity."); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1053 (9th Cir. 2002) (holding that failure to report sexual assault in asylum interview did not support adverse credibility finding).

Second, the IJ doubted Juarez-Lopez's credibility because of her account of her relationship with de la Pena.  The IJ thought it inconsistent that she would move in with and name her son after the man who repeatedly raped her.  The IJ also disbelieved that de la Pena would refuse to acknowledge Juarez-Lopez's first two sons as his own but nonetheless compel her to name the second son after him. The IJ used these facts to support his speculation that Juarez-Lopez's relationship with de la Pena may have been consensual.  But we will not defer to findings based

on personal speculation or conjecture rather than record evidence. *Shtaro*, 435 F.3d at 715; *Giday*, 434 F.3d at 550; *Dong*, 421 F.3d at 577-78; *Tabaku v. Gonzales*, 403 F.3d 417, 421 (7th Cir. 2005); *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004). Juarez-Lopez provided compelling explanations for the purported inconsistencies. She testified that de la Pena took her "by force" and told her that if she "wouldn't stay with him in the house the only people that were going to suffer the consequences were my old people, in other words, my parents." Juarez-Lopez's willingness to live with de la Pena in order to prevent violence to her parents is consistent with her testimony that she was in an abusive relationship. Juarez-Lopez testified that de la Pena forced her to name her second son after him, and she added that he "did not want to recognize them" and "did not want to give *his last name*" (emphasis added). There is no inconsistency when an individual acknowledges parenthood and simultaneously disclaims responsibility for his child's rearing. *See Shtaro*, 435 F.3d at 715 (reversing adverse credibility determination where IJ pointed to no evidence to support his assumptions about the motivations of petitioner's persecutors); *Huang v. Gonzales*, 403 F.3d 945, 949-50 (7th Cir. 2005) (explaining that IJ cannot rest adverse credibility finding on personal beliefs or on "some perceived common knowledge"); *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1050 (9th Cir. 2005) (granting petition for review where adverse credibility determination was based on IJ's "stereotypical assumptions about domestic violence," including his disbelief that an abused woman would return to her abuser).

Third, the IJ pointed to purported or perceived inconsistencies between the declaration attached to Juarez-Lopez's application for cancellation of removal and her hearing testimony. In the declaration she does not mention living with de la Pena for six months or that Ramos and de la Pena were lovers, though she does recount abuse by Ramos that was consistent with her testimony in court. However, the omission of these minor details can hardly be deemed an inconsistency, especially given that the declaration fills only four pages (the transcript of Juarez-Lopez's testimony at the hearing extends for 57 pages) and is focused on the events most critical to her claim. Adverse credibility determinations should not be based upon easily explained discrepancies or perceived discrepancies. *Korniejew*, 371 F.3d at 386-87 (noting with disfavor "the increasing reliance by the BIA and IJs upon *perceived* inconsistencies in testimony and lack of corroboration as the basis for adverse credibility determinations"). The IJ also characterized as "confusing" that Juarez-Lopez testified that she lived with her sister during and after her first pregnancy but in her declaration states that she went back to her parents' house to have the baby. Juarez-Lopez's testimony on this point is not meaningfully different. She testified in court:

> At that time that I knew that I was four months and I went to live
> again with my sister and I, I was through my whole pregnancy then I

was with my sister.  Then I decide to come back and see my parents, and then my parents, they kicked me out of the house.  So then I have to go when I was ready to go and give birth, I went to live with a friend whose name was Consuelo.

She gives a similar account in her declaration:

I was still afraid that [de la Pena] would send someone to kill me, so I went to live with my sister in El Peten for the duration of my pregnancy.  When I was about to have my son, I went back to live with my parents so they could help me take care of him.

Finally, the IJ questioned Juarez-Lopez's "honesty" about the name of her third son's father, as given on his birth certificate.  Adverse credibility determinations should not be based on matters that do not go to the heart of the asylum claim.  *Kllokoqi*, 439 F.3d at 342.  In this case, the father named on her son's birth certificate is of absolutely no relevance to her claim for asylum.  Because the discrepancy is completely peripheral, it should not have been a basis for the IJ's adverse credibility finding.

Juarez-Lopez next argues that the IJ's demand for corroboration, in the form of medical reports, police records, or family member affidavits, was unreasonable.  Review of this issue is limited by § 101(e) of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (amending 8 U.S.C. § 1252(b)(4)), which provides that "no court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable").  This provision applies in Juarez-Lopez's case.  *See id*. § 101(h); *Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005); *Hor v. Gonzales*, 421 F.3d 497, 501-02 (7th Cir. 2005).

An applicant seeking asylum bears the burden of establishing that he is a refugee, but an applicant's credible testimony can sustain this burden of proof without corroboration, 8 U.S.C. § 1158(b)(1)(B).  On the other hand, an IJ may find an applicant's testimony not credible if she "fails to present certain foundational evidence." *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004); *see also Zaidi v. Ashcroft*, 377 F.3d 678, 682 (7th Cir. 2004) ("[W]hen the IJ does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal.").  But if an IJ believes the applicant's testimony, corroboration "is not required." *Zheng v. Gonzales*, 409 F.3d 804, 810 (7th Cir. 2005) (emphasis in original); *see also Dong v. Gonzales*, 421 F.3d 573, 579 (7th Cir. 2005); *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003).  To ensure that IJs have the freedom to require supporting evidence, yet do not inappropriately demand

it, we require that, before denying a claim for lack of corroboration, an IJ must: (1) make an explicit credibility finding, (2) explain why it is reasonable to have expected additional corroboration, and (3) explain why the petitioner's reason for not producing that corroboration is inadequate. *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006); *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004).

The IJ erred by demanding corroboration before making an explicit credibility finding. The IJ plainly got the rule backwards when he asked Juarez-Lopez whether she was aware that her story "had to be corroborated by document" before she testified. "As they say in the theater," the IJ explained, it was "show time," and Juarez-Lopez had "nothing to show the court." The IJ failed at the first step by expecting Juarez-Lopez to supply corroborating documents before he heard a word of testimony.

In addition, Juarez-Lopez adequately explained the absence of corroborating documents. She did not have police or hospital reports documenting abuse by de la Pena because she never reported his attacks. She testified that she sought medical treatment and filed a police report only once, and that was when she required stitches after Ramos beat her. Juarez-Lopez explained that the events in question happened at least 14 years prior to the hearing, that she didn't know if the records still existed, and that she had not been able to bring many papers with her when she came to the United States. She said she is not in communication with any of her six siblings, and that they are "not a united family." Juarez-Lopez conceded that she does keep in touch with her mother and had spoken to her just two months before the hearing. But she explained that her parents are elderly (at the time of the hearing, her mother was 98 and her father 94) and do not hear well. Moreover, we have maintained that corroboration is not required of otherwise credible applicants for asylum who filed their applications before the REAL ID Act took effect (like Juarez-Lopez). *See, e.g., Diallo*, 439 F.3d at 766; *Dawoud*, 424 F.3d at 612; *Kllokoqi*, 439 F.3d at 344 (reversing adverse credibility finding and holding that corroborating evidence should not have been required); *see also Pavlova v. INS*, 441 F.3d 82, 91 (2d Cir. 2006) (explaining that "lack of corroborating evidence alone is not sufficient to support an adverse credibility determination"). Because the IJ's other bases for finding Juarez-Lopez not credible were unsound, her claim should not be denied on the basis of lack of corroborating evidence.

We grant the petition for review, vacate the order of removal, and remand.